UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

_____

SMITHS GROUP, PLC,

                                    Case No. 0:13-cv-00052-DSD-TNL
                    Plaintiff,

      vs.

RONALD A. FRISBIE,

                    Defendant.

_____

**MEMORANDUM OF LAW OF PLAINTIFF SMITHS GROUP, PLC
IN SUPPORT OF ITS MOTION FOR
A TEMPORARY RESTRAINING ORDER AND
EXPEDITED DISCOVERY**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND ................................................................................3

THE RESTRICTIVE COVENANTS ....................................................................6

LEGAL ARGUMENT ..........................................................................................7

I.      Standard on a Temporary Restraining Order. ...............................7

II.     Smiths Medical Will Suffer Irreparable Harm Absent Injunctive Relief. .....7

III.    The Balance Of Harms Favors Smiths Medical. .........................11

IV.     Smiths Medical Is Likely To Succeed On Its Breach Of Contract Claims. ...............................................................................................13

        A.      The Notice Provision. .......................................................13

        B.      The Non-Compete.............................................................17

V.      The Public Interest Would Be Served By A TRO. .....................20

VI.     Upon Issuance of a TRO, Smiths Medical Should Not be Required to Post a Bond. ...................................................................................21

VII.    Narrow Expedited Discovery Should Be Ordered.....................21

CONCLUSION ...................................................................................................22

Plaintiff Smiths Group, plc for its Medical Division ("Smiths Medical") respectfully submits this memorandum of law in support of its application for a temporary restraining order against Defendant Ronald A. Frisbie and expedited discovery.

## PRELIMINARY STATEMENT

Smiths Medical brings this motion to prevent one of its most senior and highly paid executives from working for a direct competitor in blatant disregard of his contractual obligations to Smiths Medical.  Mr. Frisbie is Smiths Medical's head of Global Operations and a member of its executive management team and Board.  He is privy to all of Smiths Medical's most valuable technical, financial and strategic information.

Before entrusting him with its most commercially valuable confidential information, Smiths Medical first asked Mr. Frisbie to agree to a six-month notice period before quitting and a one-year non-compete.  Mr. Frisbie agreed to those covenants.  In consideration for doing so, he was allowed to take a senior executive position near the helm of Smiths Medical, given access to all of its most sensitive information and had the opportunity to earn generous pay (annual salary of $300,000 and total compensation well over $1 million in some years).

On January 4, 2013, however, Mr. Frisbie announced that he would be leaving Smiths Medical and indicated that he does not intend to honor his contractual commitments.  He said that he would be joining Smiths Medical's direct competitor, CareFusion Corporation ("CareFusion") in two weeks' time and that, in the meantime,

CareFusion would issue a press release announcing his hire and he would participate in meetings with CareFusion investors. On January 14, 2013, counsel to Mr. Frisbie indicated that in fact Mr. Frisbie had already begun working at CareFusion earlier that morning.

The covenants which Mr. Frisbie signed are valid and enforceable.  They serve the legitimate interest of protecting Smiths Medical's confidential information and proprietary third-party relationships.  They are reasonable in scope and would impose no undue hardship on Mr. Frisbie.  Indeed, during the six-month notice period, Mr. Frisbie would continue to earn his salary ($300,000 annually) even if he does no work.  During the non-compete period, Mr. Frisbie would be free to work for a company that does not compete directly with Smiths Medical.

If Mr. Frisbie is permitted to disregard his contractual commitments, Smiths Medical will suffer severe and irreparable harm.  Given Mr. Frisbie's high-level position, membership on the executive management team and Board and broad range of responsibilities covering all aspects of Smiths Medical's Global Operations, he is in possession of a vast and diverse array of competitively valuable confidential information – ranging from manufacturing and technology secrets, to costs, profits and margin data, to customer ordering patterns, to strategic plans for new products and markets, among many other categories.  It will be impossible for Mr. Frisbie to work for a direct competitor without his extensive and detailed knowledge of virtually every aspect of Smiths Medical's business giving him and CareFusion an unfair advantage.  For these reasons, Mr. Frisbie should be temporarily restrained from working at CareFusion.

## FACTUAL BACKGROUND

Smiths Medical

Smiths Medical, an unincorporated division of Smiths Group, plc, is a leading global provider of medical products for the hospital, emergency, home and specialist environments. *See* Declaration of Srinivasan Seshadri ("Seshadri Decl.") ¶ 8. It manufactures and distributes a wide range of devices, including products and components used in infusion systems, diabetes therapy, respiratory treatments, pain management, assisted reproduction, and pressure monitoring. Its manufacturing operation is concentrated in the U.S., the U.K., China, Mexico and Italy. Its management team is primarily located in St. Paul, Minnesota. *Id.* ¶¶ 9-10.

CareFusion's Competition with Smiths Medical

Like Smiths Medical, CareFusion is a global provider of medical products. Both companies have a large and diverse array of product offerings and global operations. CareFusion competes in approximately 30%-40% of all the market categories occupied by Smiths Medical's lineup. In each of these categories, competition is based on, among other things, quality, safety and price. *Id.* ¶ 11.

Smiths Medical and CareFusion are direct competitors in the global market for infusion pumps. Infusion pumps are devices that deliver medications or fluids intravenously into the body. Smiths Medical and CareFusion are among a small group of approximately five companies who together supply the vast majority of the worldwide infusion pump market. CareFusion is the dominant player. *Id.* ¶¶ 12-13.

Smiths Medical and CareFusion also compete in relation to a number of product lines in the "airway" market.  Within this area, both companies offer products designed for use in airway access, hypoxemia management, respiratory care, nebulizers, respiratory filtration and monitoring, tracheotomy care and pain management.  Smiths Medical and CareFusion are also direct competitors in certain specialty products, such as transport ventilators.  *Id.* ¶ 14.

In total, the product areas in which the companies directly compete account for approximately 30%-40% of Smiths Medical's total revenue.  In addition, both companies are actively seeking to expand into certain emerging markets.  Their competition, therefore, spans worldwide and permeates throughout a broad array of product offerings. *Id.* ¶¶ 15-16.

Mr. Frisbie's Employment at Smiths Medical

Mr. Frisbie began work at Smiths Medical on September 17, 2007 as head of Global Operations.  As head of Global Operations, Mr. Frisbie reports directly to the President of Smiths Medical and has overall responsibility for worldwide operations, composed of three areas:

- As head of global manufacturing, Mr. Frisbie is responsible for all manufacturing processes and performance.  He oversees all Smiths Medical factory operations and is privy to, and in many instances has helped develop, confidential systems and strategies that remain in place across the company's manufacturing chain.

- As head of global supply chain functions, Mr. Frisbie is responsible for the management of all product orders, distribution and logistics.  He has intimate knowledge of the company's warehouses, customer sites, and all other logistical aspects of bringing Smiths Medical's products from manufacture to customer.

- As head of global sourcing and purchasing, Mr. Frisbie is responsible for the procurement of material used in the manufacture of all products and has intimate knowledge of the company's suppliers, as well as the cost structure and profitability of all of Smiths Medical's products.

For each of these areas, Mr. Frisbie oversees an array of fiscal issues, such as inventory management, cost containment, budgeting, and strategic development. *Id.* ¶¶ 18-22.

As a member of Smiths Medical's Divisional Board and its executive management team, Mr. Frisbie has been deeply involved in all of Smiths Medical's most high-level planning concerning all aspects of the business, including sales, marketing, new product development, finance and competitive strategy. *Id.* ¶ 23.

Mr. Frisbie has been generously compensated by Smiths Medical. His annual salary is $300,000. In addition, he has been paid sizable cash bonuses and has participated in stock ownership and other incentive compensation plans available to senior executives. The value of his total compensation package in 2011, for example, was over $1.3 million. *Id.* ¶¶ 24.

Mr. Frisbie's Resignation

On the morning of January 4, 2013, Mr. Frisbie walked into the office of Smiths Medical's President and said he was quitting and would start at CareFusion in two weeks' time. Later in the day, Mr. Frisbie informed Smiths Medical's Human Resources group that CareFusion intended to issue a press release, as early as on January 7, announcing that Mr. Frisbie had joined CareFusion. Mr. Frisbie later informed HR that CareFusion wanted Mr. Frisbie to participate in meetings with its investors during the week of January 7. *Id.* ¶¶ 34-38.

**THE RESTRICTIVE COVENANTS**

Before Mr. Frisbie started at Smiths Medical, he executed two contracts:  a Terms of Employment (*Id.*, at Ex. A) and an Agreement Concerning Confidential Information, Competition and Assignment of Inventions (*Id.*, at Ex. B).

Pursuant to paragraph 12 of the Terms of Employment, Mr. Frisbie agreed to give Smiths Medical six-months' notice before quitting.  Specifically, paragraph 12 provides:

> In the event that you decide to terminate your employment
> voluntarily, you agree to provide to the Company no less
> [than] six (6) months written notice.

*Id.*, at Ex. A.

Pursuant to Section F of the Agreement Concerning Confidential Information, Competition and Assignment of Inventions, Mr. Frisbie further agreed to a one-year non-compete (the "Non-Compete").  Specifically, Section F(b) provides:

> I agree that for a period of one (1) year after termination of
> my employment with the Company: . . . [i]f I have been or am
> employed by the Company in a non-sales or marketing
> capacity, I will not render services, directly or indirectly, to
> any Conflicting Organization nationwide in connection with
> the design, development or manufacture of a Conflicting
> Product.

CareFusion is a "Conflicting Organization," and CareFusion's infusion pumps, airway products,  and other products are "Conflicting Products," as defined in the contract. *Id.* ¶ 29.  The contract defines "Conflicting Organization" as:

> any person or organization or affiliate thereof which is
> engaged in, or about to become engaged in, the research or
> development, production, marketing, leasing, selling or
> servicing of a Conflicting Product.

The contract further provides that

> The term "Conflicting Product" shall mean any product, process, system or service of any person or organization other than the Company, in existence or under development, which is the same as or similar to or competes with a product, process, system or service upon which my department has worked during the last two (2) years of employment and about which I acquire Confidential Information.

*Id.* Ex. B, § F(c)-(d).

## LEGAL ARGUMENT

### I.  Standard on a Temporary Restraining Order.

A court considers four factors in determining whether a TRO should issue:  (1) the threat of irreparable harm to the movant in the absence of relief; (2) the balance between that harm and the harm that the relief may cause; (3) the likelihood of the movant's ultimate success on the merits; and (4) the public interest.  *See Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *Life Time Fitness Inc. v. DeCelles*, 854 F. Supp. 2d 690, 694-95 (D. Minn. 2012) (Doty, J.).

### II.  Smiths Medical Will Suffer Irreparable Harm Absent Injunctive Relief.

Courts in Minnesota recognize that irreparable harm may be inferred from the breach of a valid employee restrictive covenant.  *See, e.g., Guidant Sales Corp. v. Baer*, No. 09-CV-0358, 2009 WL 490052, at *6 (D. Minn. Feb. 26, 2009) ("irreparable harm may be inferred from the breach of a valid noncompete agreement"); *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1091 (D. Minn. 1981), *aff'd*, 684 F.2d 565 (8th Cir. 1982) ("[A] threat of irreparable harm can be inferred from the breach of a valid and enforceable restrictive covenant."); *Creative Commc'ns Consultants, Inc. v. Gaylord*, 403 N.W.2d 654, 657 (Minn. Ct. App. 1987) (same).  As discussed in Section IV, below, the

restrictive covenants to which Mr. Frisbie agreed are valid and enforceable. His breach of them alone gives rise to a presumption that Smiths Medical will suffer irreparable harm.

Legal presumptions aside, the threat of irreparable harm is evident from the broad nature of Mr. Frisbie's responsibilities at Smiths Medical and his intimate familiarity with so many aspects of its most competitively valuable confidential information. Courts in Minnesota recognize that where, as here, an employee takes confidential information to a competing employer, disclosure is inevitable – whether it is explicitly conveyed or merely reflected in the employee's work. *See, e.g., Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264, 1269-70 (8th Cir. 1978) (finding irreparable harm despite assurances of good faith because former technical employee's work for competitor would inevitably reflect knowledge of former employee's confidential information); *Minn. Mining & Mfg. Co. v. Kirkevold*, 87 F.R.D. 324, 333 (D. Minn. 1980) (finding a claimed intention not to disclose or receive confidential information insufficient to prevent harm, noting that an employee working in the same field "can hardly prevent his knowledge of his former employer's confidential methods or data from showing up in his work") (quoting Harlan J. Blake, Employee Agreements Not to Compete, 73 Harv. L. Rev. 625, 669-70 (1960)); *Kallok v. Medtronic, Inc.*, No. C2-96-1598, 1997 WL 20338, at *2 (Minn. Ct. App. Jan. 21, 1997), *rev'd on other grounds*, 573 N.W.2d 356 (Minn. 1998) (confidential information would inevitably color research and operational decisions made while in employ of competitor, causing former employer irreparable harm).

Given Mr. Frisbie's broad responsibility for every aspect of Smiths Medical's global operations and his participation in the highest level strategic planning, he has access to a wide array of confidential information.  For example:

- As a member of the senior executive management team, Mr. Frisbie was deeply involved in the development of Smiths Medical's recent global strategic plan, which will be presented to the Board of Smiths Group later this month.  The plan sets out in detail a 3-4 year plan for: how the company intends to compete, where it intends to focus its investments, what new products it intends to launch, and what improvements it intends to make to its supply chain.  Knowledge of this detailed competitive game plan will give Mr. Frisbie an obvious unfair advantage as he helps CareFusion refine its own strategies and plans for competing.

- Mr. Frisbie oversees the development of all Smiths Medical's operations technology, including technologies used to manufacture infusion pumps and airway products.  His team has developed proprietary molding and extrusion technologies integral to product design, which have permitted Smiths Medical to achieve a cost structure and quality that give it a key advantage over competitors like CareFusion.

- Mr. Frisbie oversees the company's investments in operations technology, and is therefore privy to sensitive information about current operational strengths and weaknesses.  He very recently oversaw the development of a plan to rationalize Smiths Medical's manufacturing footprint.  Development of this plan involved a detailed assessment of the strengths and weaknesses of the company's supply chain and the identification of key areas in which the supply chain can be improved to reduce costs and delays.  Knowledge of these assessments and plans would give Mr. Frisbie an obvious unfair edge as he guides CareFusion in refining its own supply chain to compete with Smiths Medical more effectively.

- Mr. Frisbie possesses key information about costs and margins on all Smiths Medical products, including its offerings that compete directly with CareFusion's product lines.  In the hands of CareFusion, this information would make Smiths Medical vulnerable to targeted pricing pressure and marketing efforts in those product areas where its margins are lowest and it is most vulnerable.

- Mr. Frisbie was recently involved in a business impact assessment related to the company's supply chain risks.  This information is extremely sensitive and would provide CareFusion with an unfair competitive advantage if any risks considered in this assessment materialized, because it would have a clearer understanding of the implications for Smiths Medical's ability to supply competing products.

- Mr. Frisbie is responsible for the R&D team based in China. He has intimate knowledge of Smiths Medical's research and development efforts in China and the pumps being designed by that team to meet local market needs. Knowledge of Smiths Medical's product strategy in China would provide CareFusion with a significant unfair advantage in pre-empting Smiths Medical's plans for the China market.

- As co-chair of the Manufacturing Quality Council, Mr. Frisbie is further aware of the regulatory status of the full array of Smiths Medical's devices. He is familiar with the expected timetable for regulatory clearance, as well as the resolution of any concerns identified by relevant agencies, including confidential redesigns of certain products.

- Mr. Frisbie is familiar with all key new product initiatives, including cost structures, regulatory status, and launch plans, as well as sensitive intellectual property information, including strategies surrounding new and expiring patents. This knowledge will give CareFusion an unfair advantage in its own new product strategies and initiatives.

- Mr. Frisbie also possesses valuable customer information gleaned from his time at Smiths Medical. He is, for example, aware of order and backorder status with regard to all customers, the latter of which, in particular, could prove of significant value to a competitor that wishes to quickly exploit temporary shortages in the company's supply chain.

- Mr. Frisbie was also regularly provided with information, in his capacity as co-chair of the Manufacturing Quality Council, detailing customer complaint trends and the company's efforts to respond to any quality concerns.

- As head of Global Operations, Mr. Frisbie has also maintained many key relationships with suppliers and other third parties on behalf of Smiths Medical. The third-party links in the company's supply chains constitute a significant company investment, and Mr. Frisbie's departure for CareFusion could put certain of those relationships at risk.

Seshadri Decl. ¶¶ 39-56.

It strains credulity to suggest that Mr. Frisbie could work for a direct competitor without gaining an unfair advantage based on his categorical knowledge of every aspect of Smiths Medical's operations, strengths, weaknesses, costs, margins, strategies, new

product and market initiatives, customers, and suppliers. This unfair advantage will cause severe and irreparable damage to Smiths Medical's business.  Seshadri Decl. ¶¶ 39-56

Mr. Frisbie is also uniquely positioned to lure away other valuable employees to join him at CareFusion.  In recent months, CareFusion has targeted other operations personnel from Smiths Medical (including the company's head of manufacturing operations in Mexico).  With Mr. Frisbie, CareFusion now has unique access to Smiths Medical's organizational structure and personnel, precisely at a time when the company is most vulnerable as a result of Mr. Frisbie's abrupt departure.  Given his disregard of his notice and non-compete obligations, there is no reason to assume that he will honor his anti-poaching covenant (*see id.*, Ex. B, § G), and if Mr. Frisbie is allowed to disregard his obligations with impunity, other employees whom he may solicit will assume that they may disregard any similar obligations they may have.  *Id.* ¶ 57.

## III.   The Balance Of Harms Favors Smiths Medical.

The balance of harms tips decidedly in favor of injunctive relief.  For the reasons described in the preceding Section, Smiths Medical faces a risk of very severe irreparable harm in the absence of injunctive relief.

On the other side of the scale, any hardship Mr. Frisbie may experience as a result of observing his commitments will be modest.  Assuming compliance with contractual requirements, Mr. Frisbie will continue to be paid his salary ($300,000 annually) through the six-month notice period, even if he does no work for Smiths Medical.  Moreover, the Non-Compete prohibits Mr. Frisbie only from working for a direct competitor.  As a

11

practical matter, there are only a small number of companies that he would be prevented from joining. *Id.* ¶ 30, Ex. C (excerpts from 2012 Smiths Group Annual Report listing CareFusion as one of only a small group of named competitors).

This is not a case in which an employer seeks to restrain an employee from working in the industry or profession to which the employee has devoted his whole professional life. Mr. Frisbie is an expert in the area of operations, a skill set which makes him employable in dozens of other industries. Indeed, the bulk of his career (more than 20 years) was spent as an operations executive in the automotive industry for Ford Motor Company. *Id.* ¶ 30. By accepting a position at CareFusion, he has demonstrated that he is willing to move out-of-state for a job.

Given the broad applicability of Mr. Frisbie's operations expertise and his apparent willingness to travel for work, there is a vast array of job opportunities he could pursue that would not violate his contractual commitments. *Life Time Fitness, Inc. v. Wallace*, No. 12-740, 2012 WL 1517262, at *3 (D. Minn. Apr. 30, 2012) (balance of harms favored granting TRO enforcing non-compete when breach caused plaintiff to lose good will and "it seems unlikely that [defendant] will be prevented from making a living"); *Baer*, 2009 WL 490052 at *7 (balance tips strongly in favor of granting TRO when defendant will continue to be compensated regardless of TRO); *Esquire Search, Ltd. v. Dietrich*, 2003 WL 22663862, at *2 (D. Minn. Nov. 7, 2003) (balance of harms favored granting TRO when defendant who violated non-compete clause would not be precluded from generating income from other means). He would have the luxury of being paid handsomely for the next six months, without having to do any work for Smiths

Medical, while he explores such other opportunities.  And, of course, following the non-compete period, he is free to work for CareFusion or any other competitor.

## IV.   Smiths Medical Is Likely To Succeed On Its Breach Of Contract Claims.[1]

A TRO is appropriate where the movant shows a "fair chance of prevailing" on its claims.  *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  Mr. Frisbie's employment with CareFusion would be a clear breach of two contractual provisions to which he agreed: (A) the notice provision in the Terms of Employment and (B) the Non-Compete contained in the Agreement Concerning Confidential Information, Competition and Assignment of Inventions.  As detailed in the following two sub-sections, both covenants are valid and enforceable.

### A.   The Notice Provision.

Mr. Frisbie agreed that he would give six months written notice before quitting his job at Smiths Medical.  Seshadri Decl. Ex. A, § 12.  Notice provisions of this kind are commonplace for senior executives in the United Kingdom.  (At the time the contract was negotiated and executed, in London, the worldwide headquarters of Smiths Medical was in London and the management team was primarily located there.)  During the six-month notice period, Mr. Frisbie remains an employee of Smiths Medical, owes the company his undivided loyalty, continues to receive his salary of $300,000 per annum, but would not necessarily be required to do any work.  *Id.* ¶¶ 26-28.  A notice provision

---

[1]   Smiths Medical is also likely to succeed on the merits of its other claims, but focuses on its primary claims for purposes of this expedited proceeding.

13

is, therefore, a form of employee restrictive covenant.  Mr. Frisbie would unquestionably be breaching the provision were he to begin work at CareFusion during the notice period, while he is still being paid by Smiths Medical.

Because the Terms of Employment expressly contemplated that Mr. Frisbie would be based in St. Paul (and that he in fact was based there throughout his tenure), we assume that Minnesota law governs the contract (which has no express choice-of-law provision).

Restrictive covenants contained in employment agreements are enforced under Minnesota law when they are supported by adequate consideration and reasonable.  *See Prow v. Medtronic, Inc.*, 770 F.2d 117, 120 (8th Cir. 1985) (interpreting Minnesota law). Consideration is not an issue given that Mr. Frisbie agreed to the covenant, before his start date, as a condition of being employed by Smiths Medical.  Seshadri Decl. ¶ 25; *see also Overholt Crop Ins. Serv. Co. v. Bredeson*, 437 N.W.2d 698, 702 (Minn. Ct. App. 1989) ("Since appellant and respondent entered into this noncompetition agreement at the inception of the employment relationship, no independent consideration is necessary to support the agreement.").

To determine the reasonableness of a restrictive covenant, courts consider: whether the restraint is necessary for the protection of the business or goodwill of the employer; whether the restraint is greater than necessary to adequately protect the employer's legitimate interests; how long the restriction lasts; and the geographic scope of the restriction.  *See Prow*, 770 F.2d at 120; *Life Time Fitness*, 854 F. Supp. 2d at 696.

As detailed in Section II (addressing irreparable harm), the notice period is necessary to protect Smiths Medical's commercially valuable confidential information from misuse by CareFusion.  Courts in Minnesota routinely enforce employee restrictive covenants to protect sensitive business information.  *See, e.g., Kallok*, 1997 WL 20338, at *2 (research and operational data regarding the development of cardiac medical devices); *Cherne Indus. Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 89-91 (Minn. 1979) (list of prospective customers); *Medtronic, Inc. v. Hughes*, No. A10-998, 2011 WL 134973, at *3 (Minn. App. Jan. 18, 2011) ("marketing strategies, pricing information, and sales data"); *Roth v. Gamble-Skogmo., Inc.*, 532 F. Supp. 1029, 1031-32 (D. Minn. 1982) ("company information and policy including long and short range planning, sales data, pricing, and the opening and closing of retail outlets").  Minnesota courts have recognized that protection of such information warrants enforcement of a restrictive covenant specifically in the medical devices industry on multiple occasions.  *See, e.g., Medtronic, Inc. v. Sun*, Nos. C7-97-1185, C9-97-1186, 1997 WL 729168, at *4 (Minn. App. Nov. 25, 1997) (enforcing a one-year restrictive covenant against former research scientists at a medical device company); *Kallok*, 1997 WL 20338, at *2 (same).

The six-month notice period is also eminently reasonable and imposes no undue burden on Mr. Frisbie.  The six-month duration is well within the range that Minnesota courts find reasonable.  *See, e.g., Boston Scientific Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1039 (D. Minn. 2010) (noting that one-year restrictions are "consistently" found to be reasonable); *Life Time Fitness*, 854 F. Supp. 2d at 696 (one-year restriction held reasonable).  In particular, courts in Minnesota have enforced restrictive covenants of

longer duration where, as here, the exploitation of confidential information is a concern. *See Modern Controls, Inc.*, 578 F.2d at 1266, 1268-69 (two year restriction found reasonable where employee had access to confidential information related to competitor's business); *Minn. Mining & Mfg. Co.*, 87 F.R.D. at 332, 335 (same); *Hughes*, 2011 WL 134973, at *5-6 (same, for one year restriction); *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 453 (Minn. App. 2001) (same, for two years). High-level employees such as Mr. Frisbie raise heightened concerns. As this Court noted in the *Roth* case, where a senior executive has "access to the long range plans of the company," post-employment restrictions of greater than normal duration are justified because "the competitive advantage of having such knowledge dissipates slowly." 532 F. Supp. at 1031.

While the notice provision does not contain limitations on geographic scope, that is appropriate given the genuinely worldwide nature of Smiths Medical's and CareFusion's businesses and Mr. Frisbie's global responsibilities. Smiths Medical and CareFusion compete in markets around the world and Mr. Frisbie was responsible for Smiths Medical's worldwide operations. *See generally* Seshadri Decl.

Finally, the reasonableness of the covenant is enhanced by the fact that Mr. Frisbie will be paid his full salary during the six-month notice period. Courts in this and other jurisdictions consistently find that any concerns about the reasonableness of a restrictive covenant are mitigated or even eliminated where, as here, the employee is paid throughout the restricted period. *See, e.g., Roth*, 532 F. Supp. at 1032 (covenant reasonable where restriction was "commensurate with the receipt of benefits from the

[former employer]"); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 71 (2d Cir. 1999) (upholding 6-month non-competition agreement because of employer's provision of employee-salesman's annual compensation); *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 472 (S.D.N.Y. 2001) (payment during restriction period made ''virtually non-existent [the] concern that [the former employee] could lose his livelihood'').

### B.    The Non-Compete.

Smiths Medical is also likely to prevail on its claim for breach of the Non-Compete contained in the Agreement Concerning Confidential Information, Competition and Assignment of Inventions.  Mr. Frisbie agreed that for a period of one year following the termination of his employment he would "not render services, directly or indirectly, to any Conflicting Organization nationwide in connection with the design, development or manufacture of a Conflicting Product."  Seshadri Decl. Ex. B, § F(b).  As CareFusion is a "Conflicting Organization," and CareFusion's infusion pumps, airway products, and other products are "Conflicting Products," as defined in the contract, there is no question that Mr. Frisbie would be in breach of this covenant were he to begin work at CareFusion during the restricted period. *Id.* ¶ 29.  The contract is governed by Delaware law. *Id.* Ex. B, § J.

Enforceability of restrictive covenants under Delaware law is judged according to several factors, largely mirroring those examined under Minnesota law.  Under Delaware law, a non-compete must:  "(1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the

17

equities." *Am. Homepatient, Inc. v. Collier*, No. Civ. A. 274-N, 2006 WL 1134170, at *2

(Del. Ch. Apr. 19, 2006).  All requirements are met here.

*First*, as with the Terms of Employment, Mr. Frisbie was offered employment as

consideration for signing the Agreement Concerning Confidential Information,

Competition and Assignment of Inventions, and there can be no dispute therefore that the

agreement was supported by adequate consideration.  *See Research and Trading Corp. v.

Powell*, 468 A.2d 1301, 1305 (Del. Ch. 1983) (employment adequate consideration for

restrictive covenants).

*Second*, the Non-Compete is reasonable in geographic and temporal scope.  The

Non-Compete restricts Mr. Frisbie's employment options for only one year.  Covenants

of far longer durations are regularly upheld under Delaware law.  *See, e.g., Hough

Assocs., Inc. v. Hill*, No. Civ. A. 2385-N,  2007 WL 148751, at *6 (Del. Ch. Jan. 17,

2007) (non-compete lasting three years from termination of employment was reasonable

for founding member and project manager of engineering firm); *Singh v. Batta Envtl.

Assocs., Inc.*, No. Civ. A. 19627, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003)

(enforcing two year non-compete); *Del. Express Shuttle v. Older*, No. Civ. A. 19596,

2002 WL 31458243, at *14 (Del. Ch. Oct. 23, 2002) (two year non-compete found

reasonable for sales and marketing manager).  In light of the broad array of

responsibilities held by Mr. Frisbie as head of Global Operations, as well as the technical

knowledge and experience he gained at Smiths Medical, one year of restriction is a

narrow, conservative protection of the company's interests.  *See Del. Express Shuttle*,

2002 WL 31458243, at *14 ("Reasonableness of duration must be determined based upon the nature of the employee's position and the context of a particular industry.").

The nationwide geographic scope of the non-compete is also appropriate – indeed, it is overly narrow – because Smiths Medical's operations are global (as detailed more fully in the preceding sub-section concerning the notice provision). *See, e.g., O'Leary v. Telecom Res. Serv., LLC*, C.A. No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Jan. 14, 2011) (nationwide non-competition clause valid where company's business conducted nationwide); *Weichert Co. of Penn. v. Young*, C.A. No. 2223-VCL, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007) ("[T]he reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect." ); *Del. Express Shuttle*, 2002 WL 31458243, at *13 ("Restrictions that disallow activities that are 'in competition with' or involve 'soliciting' customers of the employer ... inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer…").

*Third*, the Non-Compete advances Smiths Medical's legitimate interests.  As discussed in Section II (addressing irreparable harm) and Section IV.A (addressing the notice provision), Mr. Frisbie's plan to begin working for a direct competitor immediately puts at risk a wealth of confidential information developed at great expense and effort.  Protection of confidential information "[has] long been recognized as [a] legitimate economic interest[] of a former employer" warranting enforcement of a non-compete. *Tristate Courier & Carriage, Inc. v. Berryman*, No. 20574-NC, 2004 WL

835886, at *10 (Del. Ch. Apr. 15, 2004).  Mr. Frisbie's Non-Compete is aimed also at protecting valuable supplier and customer relationships that may be exploited in the wake of his departure.  Such goodwill and established relationships are also well recognized interests justifying post-employment restrictions.  *See, e.g., Weichert Co. of Penn.*, 2007 WL 4372823, at *3-5 (recognizing former employer's legitimate interest in protecting goodwill with customers, employees, and third-party businesses); *Tristate Courier & Carriage, Inc.*, 2004 WL 835886, at *10 (employer has a "legitimate interest in preventing [employee's] contacts, developed as an employee and officer of [employer], from being used in competition against it.").

*Finally*, for the reasons described above in Section II (addressing the balance of harms), the balance of equities favors enforcement of the Non-Compete.  Mr. Frisbie is restricted only from a narrow range of competitive activities and has been handsomely paid by Smiths Medical.  He is free to take his general operational skills and experience to an employer that does not directly compete with Smiths Medical.  On the other hand, if the Non-Compete is not enforced, a great store of valuable confidential information belonging to Smiths Medical will suddenly be at the disposal of a direct competitor, yielding lasting, irreparable harm.

## V.    The Public Interest Would Be Served By A TRO.

The public interest is best served by upholding valid covenants not to compete, and restraining unfair competition.  *See Millard v. Elec. Cable Specialists*, 790 F. Supp. 857, 863 (D. Minn. 1992); *Cherne*, 278 N.W.2d at 94.  If injunctive relief were

unavailable to enforce valid covenants not to compete, employers would have little ability to protect their businesses from unfair competition by former employees.

**VI.     Upon Issuance of a TRO, Smiths Medical Should Not be Required to Post a Bond.**

Where this motion seeks only to restrain Mr. Frisbie from violating his contractual obligations, Smiths Medical respectfully requests that the Court either dispense with the requirement of a bond or require a bond of no more than a nominal amount. Under similar circumstances, district courts within the Eighth Circuit have required only a minimal bond.  *See e.g.*, *DeCelles*, 854 F. Supp. 2d at 697 (plaintiff required to post $5,000 bond as condition of temporary restraining order enjoining defendant from violating non-compete and non-disclosure requirements of contract); *Wallace*, 2012 WL 1517262, at *5 (same: $1,000 bond); *Univ. Hosp. Servs., Inc. v. Hennessy*,  No. Civ. 01-2072, 2002 WL 192564, at *4 (D. Minn. Jan. 23, 2002) (same: $10,000); *IKON Office Solutions, Inc. v. Dale*, 170 F. Supp. 2d 892, 899 (D. Minn. 2001) (same: $1,000 bond), aff'd, 2001 WL 1269994 (8th Cir. Oct. 24, 2001).

**VII.     Narrow Expedited Discovery Should Be Ordered.**

In advance of a preliminary injunction hearing, Smiths Medical seeks narrow, targeted, expedited discovery.  Expedited discovery is commonly allowed in employee restrictive covenant cases.  *See, e.g., LEXIS-NEXIS v. Beer*, 41 F. Supp. 2d 950, 953 (D. Minn. 1999).  Here, Smiths Medical seeks only very narrow discovery targeted at obtaining information that may be of particular use to the Court in determining a preliminary injunction motion.  Specifically, Smiths Medical seeks an order requiring Mr.

Frisbie to (1) produce immediately all documents in his possession, custody or control that concern or reflect any communications with CareFusion prior to January 7, 2013; and (2) return immediately all Smiths Medical documents in his possession, custody or control.

## CONCLUSION

For the foregoing reasons, Smiths Medical respectfully requests that the Court grant its application for a temporary restraining order and expedited discovery.

Dated: January 14, 2013

Respectfully submitted,

GREENE ESPEL PLLP

s/ Lawrence M. Shapiro
Lawrence M. Shapiro, P.A., #130886
Campbell Mithun Tower – Suite 2200
222 South Ninth Street
Minneapolis, Minnesota 55402
(612) 373-8325

-and-

DEBEVOISE & PLIMPTON LLP
Jyotin Hamid, Esq.*
Claire Martirosian, Esq.*
919 Third Avenue
New York, New York 10022
(212) 909-1031
*Admitted *pro hac vice*

*Counsel for Plaintiff Smiths Group, plc*