UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

SMITHS GROUP, PLC,

                Plaintiff,

vs.

RONALD A. FRISBIE,

                Defendant.

Case No. 0:13-cv-00052-DSD-TNL

---

### DECLARATION OF SRINIVASAN SESHADRI

I, SRINIVASAN SESHADRI, being duly sworn under oath, depose and say:

### Introduction

1. I am over the age of 18 and competent to testify. I am the President of Smiths Medical, an unincorporated division of Smiths Group plc, which is a public limited company based in London, England, United Kingdom. I submit this declaration, on personal knowledge, and, where indicated, on information and belief, in support of Smiths Medical's application for an order enjoining Ronald A. Frisbie from breaching his contractual notice-period and non-compete obligations to Smiths Medical.

2. On Friday, January 4, 2013, Mr. Frisbie, one of our most highly paid senior-level executives, walked into my office and announced that he intends to ignore the notice-period and non-compete obligations to which he agreed in his employment contract and begin working immediately for Smiths Medical's direct competitor, CareFusion Corporation ("CareFusion").

3. Mr. Frisbie is Smiths Medical's head of Global Operations. He oversees every aspect of the process by which our products go from raw material and components to finished

1

medical devices and other products distributed to our customers worldwide. As a member of the senior management team, he is deeply involved in the development of all of our most high-level strategic and competitive plans. He is privy to all of Smiths Medical's most valuable technical, financial and strategic information and to its confidential analyses of market developments and opportunities.

4. Before entrusting Mr. Frisbie with these responsibilities and access to this valuable information (and also in consideration for the very generous compensation he has been paid), we asked Mr. Frisbie before joining Smiths Medical to agree to certain reasonable covenants, including that he would provide us with six-months notice before quitting and that he would observe a one-year non-compete following termination of his employment. The covenants are tailored to protect Smiths Medical's legitimate interests and they would impose no undue hardship on Mr. Frisbie. Indeed, he would be paid his salary ($300,000 annually) throughout the six-month notice period, even if he does no work.

5. Mr. Frisbie agreed in writing to these covenants and we therefore retained him, paid him handsomely and entrusted him with all of our most sensitive and commercially valuable information. Now, he intends to ignore his obligations and use what he has learned from us for the benefit of our direct competitor.

6. Absent injunctive relief, we will suffer irreparable harm. Mr. Frisbie is in possession of our most sensitive, commercially valuable information, which he inevitably will use to advance the business of a direct competitor. The confidential manufacturing, sourcing and distribution processes to which Mr. Frisbie has been made privy during his time with Smiths Medical have been developed with great effort and at enormous expense to Smiths Medical.

They are of great value to CareFusion, which will, under Mr. Frisbie's guidance, be able immediately to implement various improvements to its competing business. Likewise, Mr. Frisbie's intimate knowledge of our strategic and competitive plans will provide an enormous unfair advantage to Mr. Frisbie and CareFusion as they refine their own competitive strategy.

7. Covenants such as those signed by Mr. Frisbie are designed to prevent precisely this type of unfair competition. If he is permitted to flout his obligations, Smiths Medical will suffer irreparable harm, and CareFusion will gain an unfair and unearned advantage.

### Background on Smiths Medical

8. Smiths Medical, an unincorporated division of Smiths Group, plc, is a leading global provider of medical products for the hospital, emergency, home and specialist environments. Its products are used during critical and intensive care, surgery, post-operative care during recovery, and in a series of high-end home infusion therapies.

9. Smiths Medical manufactures and distributes a wide range of devices, including products and components used in infusion systems, diabetes therapy, respiratory treatments, anesthesia management, temperature management, pain management, assisted reproduction, and pressure monitoring.

10. Smiths Medical's manufacturing operation is concentrated in the U.S., the U.K., China, Mexico and Italy. Its leadership team is primarily located in St. Paul, Minnesota.

### CareFusion's Competition with Smiths Medical

11. Like Smiths Medical, CareFusion is a global provider of medical products. Both companies have a large and diverse array of product offerings and global operations. CareFusion competes in approximately 30%-40% of the market categories occupied by Smiths Medical's

lineup. In each of these categories, competition is based on, among other things, quality, safety and price.

12. Most importantly, Smiths Medical and CareFusion are direct competitors in the global market for infusion pumps. Infusion pumps are devices that deliver medications or fluids intravenously into the body. The infusion pump market, which is highly competitive, consists primarily of three varieties of pump – large volume pumps (used in hospitals and other institutional contexts), ambulatory pumps (used by patients in hospitals and in outpatient contexts) and syringe pumps (used in hospitals and other institutional contexts) – and related disposable products. Smiths Medical and CareFusion are among a small group of approximately five companies who together supply the vast majority of the infusion pump market. Smiths Medical and CareFusion compete head to head in the infusion pump market. This market is rapidly evolving to require pumps that communicate with hospital information management systems. Both CareFusion and Smiths Medical compete on the basis of this capability.

13. CareFusion is the dominant manufacturer of infusion pumps. It markets itself as a "one system" supplier, meaning that it can supply all infusion pump needs for a given customer, unlike competitors, like Smiths Medical, who specialize in particular varieties of pumps.

14. Smiths Medical and CareFusion also compete in relation to a number of lines in the "airway" market. Within this area, both companies offer products designed for use in airway access (including anesthesia breathing circuits), hypoxemia management (including oxygen and medication delivery devices and resuscitators), respiratory care (including bronchial hygiene/lung expansion devices, suction catheters, and heat moisture exchange filters), nebulizers, respiratory filtration and monitoring, tracheotomy care and pain management.

Smiths Medical and CareFusion are also direct competitors in certain specialty products, such as transport ventilators.

15. In total, the product areas in which the companies directly compete account for approximately 30%-40% of Smiths Medical's total revenue.

16. In addition, CareFusion offers many products in markets adjacent to those occupied by Smiths Medical, resulting in significant indirect pressure, as well as the threat of expanded offerings that will erode current market shares held by Smiths Medical products. In addition, both companies are, upon information and belief, actively searching for expansion opportunities in certain emerging markets. Their competition, therefore, spans worldwide and permeates throughout a broad array of product offerings.

## Mr. Frisbie's Employment at Smiths Medical

17. Mr. Frisbie began work at Smiths Medical on September 17, 2007 as head of Global Operations. He has held that position continuously up to the present day. As head of Global Operations, Mr. Frisbie reports directly to me. By consequence of his position, Mr. Frisbie is a member of Smiths Medical's Divisional Board and its executive management team.

18. Mr. Frisbie is Smiths Medical's senior-most operations executive. His purview covers the entirety of our worldwide operations, composed of three general areas: manufacturing, supply chain and sourcing/purchasing.

19. As head of global manufacturing, Mr. Frisbie is responsible for all manufacturing processes and performance. He oversees all Smiths Medical factory operations and is privy to, and in many instances has helped develop, confidential systems and strategies that remain in place across the company's manufacturing chain.

20. As head of global supply chain functions, Mr. Frisbie is responsible for the management of all product orders, distribution and logistics. He has intimate knowledge of the company's warehouses, customer sites, and all other logistical aspects of bringing Smiths Medical's products from manufacture to customer.

21. As head of global sourcing and purchasing, Mr. Frisbie is responsible for the procurement of material used in the manufacture of all products and has intimate knowledge of the company's suppliers, as well as the cost structure and profitability of all of Smiths Medical's products.

22. For each of these areas, Mr. Frisbie oversees an array of fiscal issues, such as revenue attainment, inventory management, cost containment, budgeting, and strategic development.

23. As a member of Smiths Medical's Divisional Board and its executive management team, Mr. Frisbie has been deeply involved in all of our most high-level planning concerning all aspects of the business, including sales, marketing, new product development, finance and competitive strategy.

24. Mr. Frisbie has been generously compensated by Smiths Medical. His annual salary is $300,000. In addition, he has been paid sizable cash bonuses and has participated in stock ownership and other incentive compensation plans available to senior executives. The value of his total compensation package in 2011, for example, was over $1.3 million.

## Mr. Frisbie's Contractual Obligations to Smiths Group

25. Before Mr. Frisbie started at Smiths Medical, he and I negotiated and executed two contracts governing the terms and conditions of his employment and certain post-

employment covenants: a contract entitled Terms of Employment (a copy of which is attached hereto as **Exhibit A**) and an Agreement Concerning Confidential Information, Competition and Assignment of Inventions (a copy of which is attached hereto as **Exhibit B**).

26. We negotiated and executed both contracts in London, England, United Kingdom. Smiths Group, plc is, as noted, a U.K. company headquartered in London. Moreover, at the time the worldwide headquarters for the Smiths Medical division was in London and the management team was primarily located there. Although we subsequently moved the worldwide headquarters to St. Paul, that move was not contemplated at the time I negotiated and executed the contracts with Mr. Frisbie.

27. Pursuant to paragraph 12 of the Terms of Employment, Mr. Frisbie agreed to give Smiths Medical six-months notice before quitting. Specifically, paragraph 12 provides:

> In the event that you decide to terminate your employment voluntarily, you agree to provide to the Company no less [than] six (6) months written notice.

28. In my experience, such notice provisions are commonplace in the U.K. for senior-level executives like Mr. Frisbie. During the notice period, Mr. Frisbie remains an employee of and owes undivided loyalty to Smiths Medical, continues to receive his salary of $300,000 per annum, but would not necessarily be required to provide actual services during this time.

29. Pursuant to Section F of the Agreement Concerning Confidential Information, Competition and Assignment of Inventions, Mr. Frisbie further agreed to a one-year non-compete. Specifically, Section F(b) provides:

> I agree that for a period of one (1) year after termination of my employment with the Company: . . . [i]f I have been or am

7

>employed by the Company in a non-sales or marketing capacity, I
>will not render services, directly or indirectly, to any Conflicting
>Organization nationwide in connection with the design,
>development or manufacture of a Conflicting Product.

CareFusion is a "Conflicting Organization," and CareFusion's infusion pumps, airway products and other product lines are "Conflicting Products," as defined in the contract. The contract defines "Conflicting Organization" as:

>any person or organization or affiliate thereof which is engaged in,
>or about to become engaged in, the research or development,
>production, marketing, leasing, selling or servicing of a Conflicting
>Product.

The contract further provides that

>The term "Conflicting Product" shall mean any product, process,
>system or service of any person or organization other than the
>Company, in existence or under development, which is the same as
>or similar to or competes with a product, process, system or service
>upon which my department has worked during the last two (2)
>years of employment and about which I acquire Confidential
>Information.

30. The non-compete is reasonable in scope. It prohibits Mr. Frisbie from being employed only with competitors working on products that compete with products on which Mr. Frisbie's department worked and as to which Mr. Frisbie acquired confidential information. As a practical matter, there are only a small number of companies that he would be prevented from joining. (Attached as **Exhibit C** is an excerpt from the 2012 Smiths Group Annual Report listing CareFusion as one of only a small group of named competitors of Smiths Medical.) Mr. Frisbie's expertise in the area of operations, moreover, would make him employable in dozens of other industries. Indeed, the bulk of his career (more than 20 years) was spent as an operations executive in the automotive industry for Ford Motor Company. The duration of the covenant is

8

tied to the length of time for which our confidential information will remain competitively valuable. The geographic scope is clearly reasonable insofar as it restricts Mr. Frisbie only within the U.S. even though his responsibilities were unquestionably global.

31. The provision serves the legitimate interest of protecting important company interests. Smiths Medical produces an array of complex products using confidential processes. It has developed sensitive distribution methods designed to provide its products to consumers in an effective and cost-efficient manner. It maintains longstanding and valuable relationships with key suppliers and customers. We have invested significant resources into all aspects of the development and distribution of our products, and in an intensely competitive market we cannot afford to train our employees only for competitors to reap the benefits of that training, or to lose proprietary information and hard-won relationships to other companies.

32. Indeed, the Agreement Concerning Confidential Information, Competition and Assignment of Inventions contains Mr. Frisbie's acknowledgment that preservation of confidential information is critical to maintaining Smiths Medical's market position and therefore warrants the requirement that senior executives like Mr. Frisbie enter into appropriate restrictive covenants before beginning work. Specifically, the preamble to the contract provides:

> The growth of Smiths Medical has been due to its special competence in the field of medical devices. The Company's possession, marketing and management contribute to this growth.
>
> To obtain such information and to use it successfully, the Company invests millions of dollars annually. This results in a pool of information, which enables the Company to conduct its business with unusual success. However, this potential exists only as long as this information is retained proprietary within the Company. Once generally known, this information gives no advantages to the Company, its employees or its stockholders.

9

> Therefore, all of us have a common interest and responsibility in seeing that no one employee accidentally or intentionally discloses to people not connected with the Company any part of this pool of information.
>
> To help you, all other employees and the Company against such a possibility, this Agreement has been prepared for your signature to reflect your understanding of your responsibilities in this area.

33. The contract also contains an anti-poaching clause. Pursuant to Section G of that document, Mr. Frisbie also agreed to a one-year prohibition on poaching Smiths Medical employees. Specifically, Section G provides:

> I agree that for a period of one (1) year after termination of my employment with the Company, I will not attempt to solicit the resignation of any other employee of the Company.

### Mr. Frisbie's Resignation

34. On the morning of January 4, 2013, Mr. Frisbie asked to meet with me in my office. There, he told me that he was quitting Smiths Medical, giving me a letter to the same effect, and that he planned to take a position with CareFusion. He indicated that he does not intend to honor the notice-period and non-compete obligations contained in his contracts. Rather, he said, he planned to afford Smiths Medical only two-weeks notice before departing, and that he plans to begin working for CareFusion directly thereafter.

35. I was extremely surprised and disappointed. Mr. Frisbie has been a trusted and valuable executive at Smiths Medical for over five years, and I had no indication that he was looking for employment elsewhere, never mind with one of our direct competitors. I told him that I considered his plan a betrayal. I feel strongly that the manner in which he acted is dishonorable and disloyal to the company and to his colleagues. Not only has he blatantly

violated his contractual promises, but his actions also show a complete disregard for his team. We expected that he would honor his notice provision and that, if he ever left, there would be an orderly transition of his responsibilities. Instead, we are left scrambling to try to fill the hole Mr. Frisbie has left at the top of our organization without giving us the courtesy of anything near the notice period to which he had agreed in writing.

36. Later in the day on January 4, Mr. Frisbie informed Ron Leonhardt, Vice President of Human Resources for Smiths Medical, that CareFusion intended to issue a press release, as early as on January 7, announcing that Mr. Frisbie had joined CareFusion. Mr. Frisbie later informed Mr. Leonhardt that CareFusion wanted Mr. Frisbie to participate in meetings with its investors during the week of January 7.

37. We commenced this action on January 7. After the action was filed, I understand that Mr. Leonhardt and Adam Jones, Smiths Medical's General Counsel, met with Mr. Frisbie and informed him that we expected him to abide by his contractual notice-period and non-compete obligations. Mr. Frisbie was asked to go home temporarily (with full salary) while we attempted to explore a resolution to the dispute. We also asked him to give us confirmation by email that he would not begin working with CareFusion while the dispute was pending. He has refused to give us such confirmation.

38. I understand that Mr. Jones also contacted CareFusion's general counsel on January 7, informed her that a suit had been filed against Mr. Frisbie, provided her with copies of the complaint we filed and of Mr. Frisbie's contracts, and asked for an assurance from CareFusion that they would not go forward with hiring Mr. Frisbie while the dispute was pending. CareFusion has refused to provide any such assurance.

11

### **Irreparable Harm to Smiths Medical**

39. If Mr. Frisbie is permitted to begin working for CareFusion without first observing his contractual obligations to Smiths Medical, Smiths Medical will suffer severe and irreparable harm. Mr. Frisbie is privy to a wealth of the company's most sensitive and competitively valuable trade secret information. His immediate employment by CareFusion would imperil the confidentiality of this information, as well as many of Smiths Medical's most valuable business relationships, at a time when Smiths Medical is unfairly vulnerable – in the aftermath of the sudden departure of one of its most senior and valued executives.

Competitive Strategy

40. As a member of the senior executive management team, Mr. Frisbie is intimately involved in all of our most high-level strategic plans. For example, he was deeply involved in the development of our recent global strategic plan, which will be presented to the Board of Smiths Group later this month. The plan sets out in detail our 3-4 year plan for: how we intend to compete, where we intend to focus our investments, what new products we intend to launch, and what improvements we intend to make to our supply chain. This knowledge of our detailed competitive game plan will give Mr. Frisbie an obvious unfair advantage as he helps CareFusion refine their own strategies and plans for competing with us.

Manufacturing Technologies and Sourcing Initiatives

41. As head of Global Operations, Mr. Frisbie oversees the development of all Smiths Medical's operations technology, including those technologies used to manufacture infusion pumps, airway products, and other devices. His team has developed proprietary molding and extrusion technologies integral to product design, which have permitted Smiths Medical to

achieve a cost structure and quality that give it a key advantage over competitors like CareFusion.

42. Likewise Mr. Frisbie oversees the company's capital investment in operations technology, and is therefore privy to sensitive information about current operational strengths, weaknesses, and plans. He very recently oversaw the development of a plan to rationalize our manufacturing footprint. Development of this plan involved a detailed assessment of the strengths and weaknesses of our supply chain and the identification of key areas in which the supply chain can be improved to reduce the cost of our products and delays. Knowledge of these assessments and plans would give Mr. Frisbie an obvious unfair edge as he guides CareFusion in refining their own supply chain to compete with us more effectively.

43. Mr. Frisbie has also been responsible for Smiths Medical's ongoing sourcing initiatives, aimed at reducing product and packaging costs through, among other efforts, the development and implementation of engineering initiatives and the engagement of new logistics providers in key markets.

44. If Mr. Frisbie is permitted to begin working for CareFusion, CareFusion will be in a position to benefit from all of this information. Among other advantages, Mr. Frisbie could, and inevitably will, improve CareFusion's cost structures (in line with CareFusion's stated strategy as I understand it) and manufacturing processes, including the manufacturing of competing devices such as infusion pumps, using confidential information developed at great expense and effort by Smiths Medical.

Product Development, Cost and Market Information

45. As head of Global Operations and as a senior executive serving in such positions

as co-chair of the company's Manufacturing Quality Council, Mr. Frisbie is aware of virtually all sensitive information pertaining to all company products, including with respect to cost structures, product development, market analyses and product issues.

46. In particular, Mr. Frisbie possesses key information about costs and margins on all Smiths Medical products, including its offerings that compete directly with CareFusion's product lines. With regard to all of these products, Mr. Frisbie is also aware of the company's future plans. In the hands of CareFusion, this information would make Smiths Medical vulnerable to targeted pricing pressure and marketing efforts in those product areas where its margins are lowest and it is most vulnerable.

47. Mr. Frisbie has also been involved in business continuity assessments in relation to manufacturing, sourcing and supply chain over the course of his tenure at Smiths Medical. Specifically, Mr. Frisbie was recently involved in a business impact assessment related to the company's supply chain risks. This information is extremely sensitive and would provide CareFusion with an unfair competitive advantage if any risks considered in this assessment materialized, because it would have a clearer understanding of the implications for Smiths Medical's ability to supply potentially competing products.

48. Mr. Frisbie is responsible for the R&D team based in China. He has intimate knowledge of Smiths Medical's research and development efforts in China and the pumps being designed by that team to meet local market needs. I understand that CareFusion's recent Investor Presentation makes reference to its strategy to achieve global expansion. Knowledge of Smiths Medical's product strategy in China would provide CareFusion with a significant unfair advantage in pre-empting Smiths Medical's plans for the China market.

49. As co-chair of the Manufacturing Quality Council, Mr. Frisbie is further aware of the regulatory status of the full array of Smiths Medical's devices. He is familiar with the expected timetable for regulatory clearance, as well as the resolution of any concerns identified by relevant agencies, including confidential redesigns of certain products.

50. Mr. Frisbie has also participated in many confidential product introduction meetings and product review committees. He is familiar with all key new product initiatives, including cost structures, regulatory status, and launch plans, as well as sensitive intellectual property information, including strategies surrounding new and expiring patents. This knowledge will give CareFusion an unfair advantage in its own new product strategies and initiatives.

51. If Mr. Frisbie is permitted to leave Smiths Medical and to begin work immediately with a direct competitor, the confidentiality – and the value – of this information will be corroded, and CareFusion will gain a significant strategic advantage across several product categories.

Customer and Supplier Relationships

52. Mr. Frisbie also possesses valuable customer information gleaned from his time at Smiths Medical. He is, for example, aware of order and backorder status with regard to all customers, the latter of which, in particular, could prove of significant value to a competitor that wishes to quickly exploit temporary shortages in the company's supply chain.

53. Mr. Frisbie was also regularly provided with information, in his capacity as co-chair of the Manufacturing Quality Council, detailing customer complaint trends and the company's efforts to respond to any quality concerns.

54.     Mr. Frisbie has also maintained many key relationships with suppliers and other third parties on behalf of Smiths Medical. The third-party links in the company's supply chains constitute a significant company investment, and Mr. Frisbie's departure for CareFusion could put certain of those relationships at risk.

Smiths Medical's Relationship with CareFusion

55.     In addition, Smiths Medical and CareFusion have recently finalized an arrangement whereby CareFusion distributes bronchial hygiene products manufactured by Smiths Medical. This arrangement will require periodic negotiations between the two companies, and Smiths Medical's position in such negotiations is based in part on confidential information to which Mr. Frisbie, as head of Global Operations, has access, including product manufacturing and distribution cost structures. If Mr. Frisbie is permitted to join CareFusion, there will result an imbalance of information that puts Smiths Medical at a severe and unfair disadvantage in relation to CareFusion.

56.     In addition, Smiths Medical is currently considering new partnerships in other product categories, and CareFusion is among the companies with whom Smiths Medical has held preliminary discussions. Should CareFusion be permitted to hire Mr. Frisbie, it would be instantly aware of Smiths Medical's strategic planning and considerations with regard to all of these potential projects. It would gain an unfair advantage in any future negotiations with CareFusion and, even more dangerously, it may gain from Mr. Frisbie the information it requires to bypass the partnership with Smiths Medical altogether and to simply join the market as a direct competitor.

Soliciting of Smiths Medical's Employees

57.     The attempted hiring of Mr. Frisbie is the latest in a troubling trend, in which CareFusion appears to be targeting employees involved in manufacturing and product development for Smiths Medical. In recent months, three other Smiths Medical employees, including the head of our manufacturing operations in Mexico, have joined CareFusion. If Mr. Frisbie is permitted to leave in violation of his notice period and non-compete, I have a genuine concern that others may feel their contracts will go similarly unenforced. Moreover, given Mr. Frisbie's blatant disregard of his other promises, I have no reason to expect that he will honor the anti-poaching covenant to which he agreed. I am concerned that CareFusion will continue to target our personnel, now with the added benefit of Mr. Frisbie's unique knowledge of and access to our operations staff.

<u>Continuity Harms</u>

58.     Smiths Medical, like many other companies, includes not only non-competes in the contracts of many senior executives, but also paid notice periods precisely to avoid the situation it now finds itself in with respect to Mr. Frisbie, in which the company is left scrambling to fill a key, sensitive position at the helm of a highly complex global operation. The six-month notice period, during which the employee receives full salary, is necessary to provide for an orderly transition of duties to a qualified executive, including the protection of sensitive company information, and to prevent an executive with full access to Smiths Medical's technology, material, employees, and other resources from leaving the company one day and moving to another the next.

59.     In resigning without sufficient notice, Mr. Frisbie has left a hole at the top of our operations chain. Shoring that hole has now become Smiths Medical's first and consuming

priority.  In resigning so that he can go to work immediately for a direct competitor, Mr. Frisbie threatens even greater damage to our interests.  Once Smiths Medical's confidential technical, operational, financial and strategic information have been introduced into the operations of its competitor, the damage to Smiths Medical will be permanent and irreparable.

*     *     *

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of January, 2013 at St. Paul, Minnesota.

/s/ Srinivasan Seshadri<br>_____<br>Srinivasan Seshadri