# EXHIBIT A

Smiths Group, plc v. Ronald A. Frisbie

Case No. 0:13-cv-00052 DSD/TNL

Srini Seshadri
Group Managing Director



**Smiths Medical**

765 Finchley Road  London  NW11 8DS
T: +44 (0)20 8458 3232   F: +44 (0)20 8209 0904
www.smiths-group.com

August 29, 2007

Mr Ron Frisbie
30 Orchid Lane North
Plymouth
MN 55447
USA

Dear Ron

Re:   **Terms of Employment**

I am delighted on behalf of Smiths Medical (the "Company") to offer you the position of Vice President, Global Operations. The purpose of this letter is to set out the terms upon which we have agreed for your employment. The terms of this letter will be effective September 17, 2007. Please signify your acknowledgement and agreement to these terms by signing the enclosed copy of this letter, and returning it to me at your earliest convenience.

1.  You will perform on a full-time basis such duties as are assigned to you by the Group Managing Director, Srini Seshadri or his designee. Your office will be in St. Paul, MN area, but consistent with your duties, you will engage in business travel, including international travel, as necessary.

2.  Your annual base salary will be three hundred thousand dollars ($300,000) and payable in accordance with the standard payroll practices of the Company, less all statutory withholdings and deductions. Future increases, if any, to your base salary are at the Company's sole discretion, based on your performance. Your first salary review will be effective the first regularly scheduled payroll period in August 2008 and will reflect your performance at that time. Subsequent reviews shall be effective the first regularly scheduled payroll period in August of the relevant year.

3.  You will be eligible to participate in any Annual Incentive Plan (AIP) as, at the sole discretion of the Chief Executive of Smiths Group plc, may be established for Smiths Medical companies in North America from time to time. For the current fiscal year, your maximum Annual Incentive Plan payout potential will be seventy five percent (75%) of base salary. Your payout will be pro-rated for the period September 17, 2007 – July 31, 2008. A booklet explaining the AIP is enclosed.

EXHIBIT A
Case No. 0:13-cv-00052 DSD/TNL

Registered Office:
765 Finchley Road  London  NW11 8DS
Incorporated in England No. 137013

4. You will receive an automobile allowance in the amount of fourteen hundred dollars ($1,400) per month, less all statutory withholds and deductions, for the purchase and use of an automobile of a type suitable for an employee in this position.

5. You will be eligible to participate in the Smiths Group plc Senior Executive Incentive Plans, specifically the Performance Share Plan (PSP) and the Co-Investment Plan (CIP), under the respective rules of those plans. A Participants' Booklet covering the PSP and CIP is enclosed. In connection with the PSP, it is intended that, subject to the approval of the Remuneration Committee, you be granted an initial conditional award to the value of 50% of your base salary.

6. The Company will provide you with such health, dental, life and disability insurance and other benefits as may be provided from time to time generally to the employees of the Company, consistent with the terms of those benefit plans. A copy of the Smiths Choice Plan Enrollment Guide which provides the current details of these offerings and their associated costs will be sent to you on acceptance of this offer.

7. Upon your employment, you will be eligible to participate in the Smiths Group N.A. Savings Incentive Plan (401(k)). The company matches 50 cents per dollar up to the first six percent of pay that you contribute to the plan on a pretax basis. Company matching contributions are on a graduated vesting schedule with 100% vested after five years of employment. You will receive more information on this program during your employee orientation.

8. You will be eligible to participate in the Company's Retirement Plan Account. This plan is fully funded by the Company and involves a defined annual credit to your Retirement Account based on your age and salary. Vesting under the Retirement Account Plan is on a five-year cliff basis. You will receive more information on this program during your employee orientation.

9. Beginning January 2008, you will be eligible to participate in the Smiths Group Deferred Compensation Plan as well as the Executive Salary Supplement Plan. Upon acceptance of this offer, information on these plans will be sent to you directly from Smiths Group.

10. You will receive thirty (30) days i.e. two hundred forty (240) hours of paid FlexLeave each calendar year. Such FlexLeave may not be carried over year-to-year and is forfeited if not used. Vacation or FlexLeave for 2007 will be prorated to date of hire. According to the plan provisions, you will accrue 9.231 hours of FlexLeave on a biweekly basis, beginning September 17, 2007. This is in addition to applicable Public Holidays. FlexLeave Q&A is enclosed.

11. In the event that the Company terminates your employment for reasons other than cause, as determined in the sole discretion of the Company, the Company will pay you nine (9) months of severance pay, based on your then-current base salary, and will reimburse your for the Company

portion of any COBRA benefit continuation premium payments paid by you for such nine month period following your termination. The severance payments and the COBRA benefit continuation coverage are conditional on your signing and not revoking a Release and Waiver of Claims in a form acceptable to the Company.

12. In the event that you decide to terminate your employment voluntarily, you agree to provide to the Company no less six (6) months written notice. Such notice will be delivered to the Group Managing Director, Smiths Medical.

13. I enclose a copy of Smiths Group Code of Corporate Responsibility and Business Ethics, the terms of which are applicable to all Smiths Group employees worldwide.

14. This offer is contingent upon your successful completion of a drug/alcohol test prior to your first day of employment. This will be arranged upon your acceptance of this offer.

15. You agree to sign on or before September 17, 2007, the attached Agreement Concerning Competition, Confidential Information and Assignment of Inventions and return a copy to me.

Ron, I look forward to working with you on the many challenges and opportunities ahead of us, and I hope you will have a successful and rewarding career with Smiths.

Please do call me should you have any queries.

Yours sincerely,

Srini Seshadri
Group Managing Director
Smiths Medical


ACCEPTED:
Ron Frisbie

DATE: 9-2-07

# EXHIBIT B

Smiths Group, plc v. Ronald A. Frisbie

Case No. 0:13-cv-00052 DSD/TNL

## AGREEMENT CONCERNING CONFIDENTIAL INFORMATION, COMPETITION AND ASSIGNMENT OF INVENTIONS

### Our Company

The growth of Smiths Medical has been due to its special competence in the field of medical devices. The Company's possession of proprietary information about research, development, manufacturing, production, marketing and management contribute to this growth.

To obtain such information and to use it successfully, the Company invests millions of dollars annually. This results in a pool of information, which enables the Company to conduct its business with unusual success. However, this potential exists only as long as this information is retained proprietary within the Company. Once generally known, this information gives no advantages to the Company, its employees or its stockholders. Therefore, all of us have a common interest and responsibility in seeing that no one employee accidentally or intentionally discloses to people not connected with the Company any part of this pool of information.

To help protect you, all other employees and the Company against such a possibility, this Agreement has been prepared for your signature to reflect your understanding of your responsibilities in this area.

*Please read it carefully so that you understand its importance.*

### Employee Obligations

As a condition of my initial and continued employment by the Company, and in further consideration of my access to confidential information, I agree as follows:

A.  I will not directly or indirectly use or divulge Confidential Information after the term of my employment to any person not authorized by the Company to receive it, nor will I accept any employment which would involve the use or disclosure by me of Confidential Information until such time as the information becomes generally available to the public, pursuant to a non-disclosure agreement or until an officer of the Company specifically authorizes in writing such use, disclosure or employment, and I will not directly or indirectly use or disclose Confidential Information during the term of my employment unless directed to do so by the Company.

   1.  The term "Company" shall mean Smiths Medical and all of its existing or future parent, subsidiary or affiliated corporations, and any division of any of them.

   2.  The term "Confidential Information" means any oral or written information used in the Company's business that is not generally known outside the Company relating to any phase of the Company's existing or reasonably foreseeable business which is obtained by, disclosed or accessible to me, whether in writing, orally or through electronic mail or Internet use, during my employment with the Company, including information conceived, discovered or developed by me. Confidential Information includes, by way of example and not limitation, information of a technical nature such as trade secrets; manufacturing processes or devices; techniques, data, formulas, inventions, specifications and characteristics of current products or products under development; research subjects, methods and results; computer systems and software; matters of a business nature such as information about costs, margins, price and pricing policies, markets, sales, suppliers and customers; internal structures and financial affairs; product, marketing or strategic plans; financial information, personnel information, customer, vendor and supplier lists; customer, vendor and supplier needs; performance characteristics of the Company's products.

B.  I represent that my employment with the Company does not conflict with and will not be constrained by any prior business relationship or contract and that I do not possess trade secrets or other proprietary information arising out of any prior business relationship or contract which, in my best judgment would be utilized in connection with my employment with the Company. I further agree that I will not disclose any such trade secrets or other proprietary information to the Company or others.

C.   If I am requested or required to disclose Confidential Information, I will immediately notify the Company of such request or requirement so that the Company may take any action deemed by the Company to be necessary or advisable to protect the confidentiality of the Confidential Information. Unless the Company waives the protections of this Agreement in writing, I agree to take all lawful steps to protect the confidentiality of the Confidential Information and to cooperate fully with the Company's efforts to protect the confidentiality of the Confidential Information. If I am ultimately compelled to disclose Confidential Information, I agree to take all lawful efforts to limit the dissemination of, and maintain the confidentiality of, the Confidential Information.

D.   I agree that all documents or other tangible property (whether original, duplicate or electronic), including but not limited to products, equipment, records, manuals, books, forms, documents, memorandum, notes, notebooks, reports, data, calculations, files and other data contained on computer hard drives, as well as back-up files and disks, relating in any way to the business, products and/or practices of the Company, which are conceived by me or come into my possession during my employment, shall be and remain the exclusive property of the Company, and I agree to return all such documents and tangible property to the Company immediately upon termination of my employment or at such earlier time(s) as the Company may request of me.

E.   During my employment, I will not plan, organize or engage in any business competitive with any product or service relating to the existing or reasonably foreseeable business interests of the Company or conspire with others to do so.

F.   I agree that for a period of one (1) year after termination of my employment with the Company:

   a.   If I have been or am employed by the Company in a sales or marketing capacity, I will not render services, directly or indirectly, to any Conflicting Organization nationwide in connection with the marketing, sale or promotion of any Conflicting Product to any person or organization upon whom I called, or whose account I supervised on behalf of the Company, at any time during the last two (2) years of my employment at the Company; and

   b.   If I have been or am employed by the Company in a non-sales or marketing capacity, I will not render services, directly or indirectly, to any Conflicting Organization nationwide in connection with the design, development or manufacture of a Conflicting Product.

   c.   The term "Conflicting Organization" shall mean any person or organization or affiliate thereof which is engaged in, or about to become engaged in, the research or development, production, marketing, leasing, selling or servicing of a Conflicting Product.

   d.   The term "Conflicting Product" shall mean any product, process, system or service of any person or organization other than the Company, in existence or under development, which is the same as or similar to or competes with a product, process, system or service upon which my department has worked during the last two (2) years of employment and about which I acquire Confidential Information.

G.   I agree that for a period of one (1) year after termination of my employment with the Company, I will not attempt to solicit the resignation of any other employee of the Company.

H.   (a) I will grant and do hereby grant to the Company the sole and exclusive ownership of, including the sole and exclusive right to reproduce, use or disclose for any purpose, any and all reports, drawings, blueprints, data, writings, software and technical information made or prepared by me alone or with others during the term of my employment, whether or not made or prepared in the course of my employment, that relate to apparatus, compositions of matter or methods pertaining to the Company's business or which contain Confidential Information. I acknowledge that all such reports, drawings, blueprints, data, writings, software and technical information are the property of the Company and I hereby agree to assign to the Company all copyrights to all the foregoing and I waive all moral rights in connection therewith in favor of the Company.

(b) I will promptly disclose to the Company in writing all Inventions and Confidential Information that I alone or with others conceive, generate or reduce to practice, during or after working hours while I am an employee of the Company and for six (6) months following my termination of employment with respect to work performed by me for the Company. All such Inventions and proprietary information shall be the exclusive property of the Company and are hereby assigned to the Company, except as otherwise specifically agreed to by the Company in writing. Furthermore, this Agreement shall not apply to any Invention for which no equipment, supplies, facility, or trade secret information of the Company was used, and which was developed entirely on my own time, and: (1) which does not relate (a) directly to the business of the Company or (b) to the Company's actual or demonstrably anticipated research or development; or (2) which does not result from any work performed by me for the Company.

(c) I will, at the Company's expense, give the Company all assistance it reasonably requires to perfect, protect and use its rights to Inventions and Confidential Information. In particular, but without limitation, I will sign all documents, do all things, and supply all information that the Company deems necessary or desirable to: (1) transfer or record the transfer of my entire right, title and interest in and to Inventions and Confidential Information; and (2) enable the Company to obtain and maintain patent, copyright, industrial design or trademark protection anywhere in the world.

(d) By way of example and not limitation, at any time and from time to time, upon the request of the Company, I agree to execute, acknowledge, swear to, seal and deliver to the Company, any and all lawful instruments, documents and papers, give evidence and do any and all other lawful acts that, in the opinion of the Company, are or may be necessary or desirable to document such assignment, transfer and conveyance or to enable the Company to file and prosecute applications for and to acquire, maintain and enforce any and all patents, trademarks, copyrights and other property rights under United States, local, state or foreign law with respect to any such Inventions or Works (as that term is defined in the Copyright Protection Act of 1976, 17 USC §101) or to obtain any extension, validation, reissue, continuance or renewal of any such patent, trademark, copyright, or other intellectual property right. By way of further example and not limitation, I agree to meet with the Company's representatives or attorneys for the purpose of initiating, maintaining or defending litigation, administrative or other proceedings; and to participate fully in litigation, administrative or other proceedings as requested by the Company. In the event that the Company may be unable, for any reason whatsoever, after reasonable effort, to secure my signature on any patent, copyright, trademark or other intellectual property application or other papers, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agent and attorney-in-fact to act for and on my behalf to execute, acknowledge, swear to, seal and deliver to the Company and to file any such application or applications or other papers, and to do all other lawfully permitted acts to further the provisions of this Agreement.

(e) The Company agrees to reimburse me for reasonable expenses which I incur in complying with the provisions of this Agreement. I agree that I am not entitled to additional compensation beyond that paid to me for the period of time that I am employed by the Company, which compensation, along with the Company's understandings set forth in this Agreement, is expressly acknowledged to be adequate consideration for all of my promises and obligations set forth in this Agreement.

(f) I expressly acknowledge and state that all Works which are made by me (solely or jointly with others) are being created at the instance of the Company and are "works made for hire," as that term is defined in the Copyright Act of 1976, 17 USC § 101. In the event that such laws are inapplicable or in the event that any such Works, or any part thereof, are determined by a court of competent jurisdiction not to be a work made for hire, this Agreement will operate as an irrevocable and unconditional assignment by me to the Company of all my right, title and interest (including, without limitation, all rights in and to the copyrights throughout the world, including the right to prepare derivative works and the rights to all renewals and extensions) in the Works in perpetuity.

(g) I have listed on Schedule 1 my patents, inventions and writings in which I have an interest and which were made by me prior to my employment with the Company.

I.      I agree that the Company may, at its option, assign or transfer its rights under this Agreement to a third party if there is a merger, consolidation, transfer or sale of substantially all of the assets of the Company. I agree that if there is a transfer of the Company's rights under this Agreement, that this Agreement will continue to be effective, will continue to bind me and inure to the benefit of the organization or individual to whom the transfer or assignment was made.

J.      I agree that this Agreement will be governed by the laws of Delaware without giving effect to the conflict of laws provisions thereof. I agree that I am subject to the jurisdiction of the Delaware courts.

BY MY SIGNATURE BELOW, I ACKNOWLEDGE THAT I: (I) HAVE HAD SUFFICIENT OPPORTUNITY TO READ EACH PROVISION OF THIS AGREEMENT AND I UNDERSTAND EACH PROVISION OF THIS AGREEMENT; (II) HAVE HAD AN OPPORTUNITY TO REVIEW THE AGREEMENT WITH LEGAL COUNSEL OF MY CHOICE; (III) AM NOT UNDER DURESS; AND (IV) AM NOT RELYING ON ANY REPRESENTATIONS OR PROMISES THAT ARE NOT SET OUT IN THIS AGREEMENT.

Employee's Signature: _R.A. Frisbie_

Employee's Printed Name: _Ronald A. Frisbie_

Date: _9-2-07_

SCHEDULE 1

### List of Your Patents, Inventions and Writings
Prior to Employment with Smiths Medical

This Assignment of Inventions and Proprietary Information does not apply to patents, inventions and writings in which you have an interest and which were made prior to your employment the Company. However, please list any such patents, inventions or writings, without divulging any confidential or proprietary information below, by titles and approximate dates. Use a separate sheet if necessary.

— None —

Employee's Signature: *R.A. Frisbie* (signature)

Employee's Printed Name: RONALD A. FRISBIE

Date: 9-2-07

# EXHIBIT C

Smiths Group, plc v. Ronald A. Frisbie

Case No. 0:13-cv-00052 DSD/TNL

# Annual Report 2012
Smiths Group plc

**smiths**
bringing technology to life

Bringing technology to life



EXHIBIT C
Case No. 0:13-cv-00052  DSD/TNL

# Business review
Continued

Smiths Medical

**Contribution to 2012 Group revenue**

28%

**Contribution to 2012 Group headline operating profit**

35%

Percentage relates to headline operating profit before corporate costs

**Smiths Medical is a leading supplier of specialist medical devices, consumables and equipment for global markets.**

In medication delivery, our devices help treat cancer patients and provide relief to those in pain. Our vital care products reduce hospital-acquired infections, manage patients' airways before, during, and after surgery, maintain body temperature and assist reproduction through IVF therapy. Our safety products protect health workers by helping prevent needlestick injuries and reducing cross-infections.

**Headline revenue performance**
£m

£864m
+3%
(2011: £838m)



(2008: 703; 2009: 834; 2010: 858; 2011: 838; 2012: 864)

## Business features
### Principal operations regions
We have operations in over 30 countries with manufacturing concentrated in Mexico, US, UK, Italy, Germany and China. We sell to approximately 120 markets and, while the US continues to be our largest single market with around 50% of sales, we are investing to build our presence in select emerging markets.

### Customers
We estimate that three-quarters of our end customers are hospitals, with the remainder comprising the alternate care market such as homecare, clinics and other surgery centres. We have a direct sales presence in over 20 countries, and distribution arrangements in approximately 100 others.

### Competitors
The competitive landscape for Smiths Medical is complex as we compete with different companies across the broad product portfolio. Our major competitors include Covidien, Teleflex, B Braun, Becton Dickinson, C R Bard, 3M (Arizant), Hospira and CareFusion. We often compete with a small portion of a major competitor's medical business, as well as with any number of smaller, single product line companies trying to gain entrance into a particular market. This makes comparison between peers far from straightforward. In emerging markets, we compete with both large multinational companies and smaller domestic players.

### Suppliers
Our strategy is to actively engage suppliers in product innovation, value engineering and a commitment to quality. Our goal is to reduce product and supply chain costs, improve delivery performance and ensure supply continuity plans. The majority of our direct spending is on resins, plastic injection mouldings, and electronics. Among indirect purchases, freight, services, travel, temporary labour and capital equipment represent the majority.

**Headline revenue by sector £864m**
1 Medication delivery 28%
2 Vital care 41%
3 Safety devices 31%



Go to www.smiths-medical.com for more information