UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

------------------------------------------------

SMITHS GROUP, PLC,

                                        Case No. 0:13-cv-00052-DSD-TNL

                    Plaintiff,

        vs.

RONALD A. FRISBIE,

                    Defendant.

------------------------------------------------

**MEMORANDUM OF LAW OF PLAINTIFF SMITHS GROUP, PLC
IN  SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

DEBEVOISE & PLIMPTON LLP
Jyotin Hamid, Esq.*
Claire Martirosian, Esq.*
919 Third Avenue
New York, New York 10022
(212) 909-1031
*Admitted *pro hac vice*

GREENE ESPEL PLLP
Lawrence M. Shapiro, P.A. #130886
Campbell Mithun Tower, Suite 2200
222 South Ninth Street
Minneapolis, Minnesota 55402
(612) 373-0929

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND.............................................................................................2

THE NON-COMPETE .....................................................................................................2

LEGAL ARGUMENT......................................................................................................3

I.      Standard on a Preliminary Injunction. ....................................................................3

II.     Smiths Medical Will Suffer Irreparable Harm Absent Injunctive Relief. ...............4

III.    The Balance Of Harms Favors Smiths Medical. .....................................................7

IV.     Smiths Medical Is Likely To Succeed On Its Breach Of Contract Claim. ..............8

        A.      Breach of the Non-Compete. .......................................................................8

        B.      Enforceability of the Non-Compete............................................................15

V.      The Public Interest Would Be Served By A Preliminary Injunction.....................19

VI.     The Bond Should Be Reduced Or Lifted. ..............................................................19

CONCLUSION..............................................................................................................21

Plaintiff Smiths Group, plc for its Medical Division ("Smiths Medical") respectfully submits this memorandum of law in support of its application for a preliminary injunction against Defendant Ronald A. Frisbie.

## PRELIMINARY STATEMENT

On January 24, 2013, this Court entered a temporary restraining order imposing certain restrictions on Defendant Ronald A. Frisbie's activities for his new employer, CareFusion Corporation ("CareFusion").  *See Smiths Group, plc v. Frisbie*, Case No. 0:13-cv-00052-DSD-TNL, 2013 WL 268988 (D. Minn. Jan. 24, 2013) (the "TRO Decision").  Smiths Medical brings this motion for a preliminary injunction order continuing those restrictions during the pendency of this action.[1]

In light of prior proceedings and the Court's TRO Decision, there are few genuinely disputed issues to be decided on this motion.  Mr. Frisbie has not challenged the enforceability of the non-compete provision which Smiths Medical seeks to enforce. Irreparable harm may be inferred from the breach of a valid non-compete.  And Mr. Frisbie has elected not even to advance the primary defense on which he relied at the TRO stage (his objection to subject matter jurisdiction) even though he sought and was granted leave to present that defense at the hearing on this preliminary injunction motion.

The only genuinely disputed question on this motion concerns the scope of the restrictions on Mr. Frisbie's activities which would be necessary to avoid a breach of his non-compete obligations.  In the TRO Decision, this Court held that Smiths Medical is

likely to prevail on the merits of its position that the narrow set of restrictions proposed by Mr. Frisbie are insufficient.  For the reasons addressed herein, and as further detailed in the accompanying Declaration of Srinivasan Seshadri, the restrictions imposed by the TRO Decision appropriately reflect the range of activities covered by the non-compete. Mr. Frisbie's far narrower proposed restrictions are based on artificial distinctions which are divorced from the reality of how Smiths Medical's and CareFusion's respective products function, how they are designed, developed and manufactured, and how they compete in the marketplace.

## FACTUAL BACKGROUND

In light of the expedited nature of this proceeding, and given the Court's familiarity with the record presented on the TRO motion, we respectfully refer the Court to the Declaration of Srinivasan Seshadri ("Seshadri Decl.") submitted herewith, as well as to the declarations submitted in connection with Smiths Medical's application for a TRO (including Mr. Seshadri's prior Declaration ("Seshadri TRO Decl.")) for the relevant factual background.

## THE NON-COMPETE

Mr. Frisbie signed the Agreement Concerning Confidential Information, Competition and Assignment of Inventions prior to starting his employment with Smiths Medical.  Seshadri Decl. ¶ 9, Ex. A.  Pursuant to Section F of the contract, Mr. Frisbie

---

[1]   Without waiver or prejudice, Smiths Medical does not seek on this motion an order enforcing the "notice provision" which Smiths Medical sought to enforce at the TRO stage.

agreed to a one-year non-competition provision (the "Non-Compete").  Specifically,

Section F(b) provides:

> I agree that for a period of one (1) year after termination of my employment with the Company: . . . [i]f I have been or am employed by the Company in a non-sales or marketing capacity, I will not render services, directly or indirectly, to any Conflicting Organization nationwide in connection with the design, development or manufacture of a Conflicting Product.

The contract defines "Conflicting Organization" as:

> any person or organization or affiliate thereof which is engaged in, or about to become engaged in, the research or development, production, marketing, leasing, selling or servicing of a Conflicting Product.

The contract further defines the term "Conflicting Product" as:

> any product, process, system or service of any person or organization other than the Company, in existence or under development, which is the same as or similar to or competes with a product, process, system or service upon which my department has worked during the last two (2) years of employment and about which I acquire Confidential Information.

*Id.* Ex. A, § F(c)-(d).

## LEGAL ARGUMENT

### I.      Standard on a Preliminary Injunction.

Courts consider four factors in determining whether a preliminary injunction should issue:  (1) the threat of irreparable harm to the movant in the absence of relief; (2) the balance between that harm and the harm that the relief may cause; (3) the likelihood of the movant's ultimate success on the merits; and (4) the public interest.  *See Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

II.     **Smiths Medical Will Suffer Irreparable Harm Absent Injunctive Relief.**

Irreparable harm may be inferred from the breach of a valid employee restrictive covenant. *See, e.g., Guidant Sales Corp. v. Baer*, No. 09-CV-0358, 2009 WL 490052, at *6 (D. Minn. Feb. 26, 2009) ("irreparable harm may be inferred from the breach of a valid noncompete agreement"); *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1091 (D. Minn. 1981), *aff'd*, 684 F.2d 565 (8th Cir. 1982) ("[A] threat of irreparable harm can be inferred from the breach of a valid and enforceable restrictive covenant.").

The legal presumption of irreparable harm arising from breach of a valid non-compete is *not* limited, as Defendant previously contended in the TRO briefing (*see* Docket #22, Def. TRO Mem. at 25), to highly skilled scientists. *See, e.g., Esquire Search, Ltd. v. Dietrich*, No. 03-cv-5582, 2003 WL 22663862, at *2 (D. Minn. Nov. 7, 2003) (applying presumption to manager of legal recruitment company); *Boston Scientific Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1039 (D. Minn. 2010) (applying presumption to a saleswoman).

Legal presumptions aside, the threat of irreparable harm is evident from the broad nature of Mr. Frisbie's responsibilities at Smiths Medical and his intimate familiarity with so many aspects of its most competitively valuable confidential information. *See* Docket #20, Seshadri TRO Decl. ¶¶ 39-56. This Court has already rejected as implausible Mr. Frisbie's contention that he merely holds "a general or non-technical skill-set." *See* TRO Decision, 2013 WL 268988, at *3. Mr. Frisbie was the head of Global Operations, a member of the Board of Directors of Smiths Medical, and a senior member of the executive management team earning over $1 million annually. *See*

4

Docket #20, Seshadri TRO Decl. ¶¶ 17-24.  Although he denies some aspects of the

confidential information ascribed to him, Mr.  Frisbie does not deny many other aspects,

including, for example, that he was privy to Smiths Medical's highest level strategic

decision-making, plans and competitive analyses.  Seshadri Decl. ¶ 51.  Indeed, in the

Answer he has filed in this action, he admits that he was privy to Smiths Medical's

confidential information.  *See* Docket #34, Answer, at ¶¶ 14, 15.  He also acknowledged

his access to several categories of confidential information in his Agreement Concerning

Confidential Information, Competition and Assignment of Inventions.  *See* Seshadri

Decl. Ex. A.  Although certain details may be disputed, as a general matter, it is

*undisputed* that Mr. Frisbie holds valuable confidential information about Smiths Medical

products and strategic plans.

Courts in Minnesota recognize that where, as here, an employee takes confidential

information to a competing employer, disclosure is inevitable – whether it is explicitly

conveyed or merely reflected in the employee's work.  *See, e.g., Modern Controls, Inc. v.*

*Andreadakis*, 578 F.2d 1264, 1269-70 (8th Cir. 1978) (finding irreparable harm despite

assurances of good faith because former technical employee's work for competitor would

inevitably reflect knowledge of former employee's confidential information); *Minn.*

*Mining & Mfg. Co. v. Kirkevold*, 87 F.R.D. 324, 337 (D. Minn. 1980) ("[A] claimed

intention not to disclose or receive confidential information [is] insufficient to negate the

realistic threat of disclosure and the possibility of irreparable harm. …"); *Kallok v.*

*Medtronic, Inc.*, No. C2-96-1598, 1997 WL 20338, at *2 (Minn. Ct. App. Jan. 21, 1997),

*rev'd on other grounds*, 573 N.W.2d 356 (Minn. 1998) (confidential information would

inevitably color research and operational decisions made while in employ of competitor, causing former employer irreparable harm).[2]

Mr. Frisbie's current employer, CareFusion, has itself admitted that irreparable harm will occur when a head of Global Operations moves from one medical devices company to another in breach of a restrictive covenant. In a lawsuit filed last year, CareFusion sought to prevent its head of Global Operations – the position now filled by Mr. Frisbie for CareFusion and which he previously held for Smiths Medical – from working for Hospira, a competitor of CareFusion and Smiths Medical in the infusion pump and other medical devices markets. *See* Docket #30, Hamid Decl. Ex. A (verified complaint filed in *CareFusion Corp. v. Ryding, et al.*, Case No. 12CH3460 (Ill. Cir. 2012)). CareFusion asserted that given the head of Global Operation's "access to and

---

[2]     In his brief in opposition to the TRO, *see* Docket #22, Def. TRO Mem. at 24-25, Mr. Frisbie cited several inapposite cases to support his argument that Smiths Medical has not shown irreparable harm. In *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 81 (2d Cir. 2000), the Second Circuit found that a former employer had failed to demonstrate a likelihood of success on the merits and irreparable harm when the non-compete provision was unenforceable because California law, which prohibits non-compete provisions, applied to the employee's contract. Frisbie also relies on two trade secret cases: *Cannon Servs., Inc. v. Culhane*, No. Civ. 04-1597 ADM/AJB, 2004 WL 950414, at *2, 4 (D. Minn. Apr. 30, 2004) and *Medtronic, Inc. v. Elan Pharma Int'l Ltd.*, No. Civ. 06-1001 ADM/JSM, 2006 WL 983909, at *2 (D. Minn. Apr. 13, 2006). To prevail on the merits of a trade secret claim, a plaintiff must show the existence of a trade secret and actual or threatened misappropriation of that secret. Minn.Stat. § 325C.01, subd. 3. A plaintiff must also define its alleged trade secrets with sufficient specificity. *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897-98 (Minn. 1983). A plaintiff seeking to enforce a non-competition agreement, by contrast, need not meet these burdens, as the Eighth Circuit has recognized. *See Modern Controls*, 578 F.2d at 1268 ("To require an employer to prove the existence of trade secrets prior to enforcement of a covenant not to compete may defeat the only purpose for which the covenant exists. An employer need only show that an employee had access to confidential information and a court will then determine the overall reasonableness of the covenant in light of the interest sought to be protected.").

knowledge of CareFusion's trade secrets and confidential business information" he would

"inevitably use and disclose" such information in his work for Hospira. *Id.* ¶¶ 47-48.

CareFusion's CEO submitted a sworn affidavit in that action, testifying that

> [b]ecause [defendant] was directly responsible for all of
> CareFusion's manufacturing processes, it will be *impossible*
> for him to work in an operations role assisting Hospira with
> its manufacturing problems without calling upon the
> confidential information to which he was exposed at
> CareFusion.

*See* Docket #30, Hamid Decl. Ex. B (Gallahue Affidavit submitted in *Ryding* litigation),

at ¶ 10 (emphasis added).

Given CareFusion's admission – in nearly identical factual circumstances

involving the precise job now filled by Mr. Frisbie – that use or disclosure of confidential

information and irreparable harm are inevitable, Mr. Frisbie can hardly deny that the

same is true in this case.  Mr. Frisbie's attempts to avoid the impact of this admission by

his employer are unavailing.  Whether or not CareFusion prevailed in their litigation is

not relevant to the impact of CareFusion's admissions.  A witness cannot disavow his

sworn testimony merely because he was unsuccessful in his case.[3]

## III.    The Balance Of Harms Favors Smiths Medical.

The balance of harms tips in favor of injunctive relief.  As described in the section

above, Smiths Medical faces a risk of severe irreparable harm in the absence of injunctive

relief.  On the other side of the scale, as the Court already held on the TRO motion, any

---

[3]    On information and belief, CareFusion's case was dismissed on jurisdictional grounds
because of a forum-selection clause in the contract CareFusion was seeking to enforce.

"harm to Frisbie [] is mitigated by the fact that he can conform his responsibilities at CareFusion to comply with the terms of the Noncompetition Provision."  TRO Decision, 2013 WL 268988, at *5.  In fact, developments subsequent to the TRO demonstrate that Mr. Frisbie will suffer no harm at all.  Despite the restrictions imposed by the TRO, CareFusion continues to employ Mr. Frisbie in a senior position as its head of Global Operations.  Seshadri Decl. Ex. P.  CareFusion will, presumably, continue to employ him in this role even if the restrictions are continued, as Smiths Medical requests.  Mr. Frisbie is, on information and belief, earning generous compensation at CareFusion despite the restrictions imposed by the TRO Decision.  *See* Declaration of Jyotin Hamid submitted herewith ("Hamid Decl."), Ex. A.

## IV.    Smiths Medical Is Likely To Succeed On Its Breach Of Contract Claim.[4]

A preliminary injunction is appropriate where the movant shows a "fair chance of prevailing" on its claims.  *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).

### A.    Breach of the Non-Compete.

Mr. Frisbie agreed that for a period of one year following the termination of his employment he would "not render services, directly or indirectly, to any Conflicting Organization nationwide in connection with the design, development or manufacture of a Conflicting Product."  Seshadri Decl. Ex. A, § F(b).

---

[4]    Smiths Medical is also likely to succeed on the merits of its other claims, but presents its primary claim for purposes of this expedited proceeding.

In earlier proceedings, Mr. Frisbie maintained that his employment with CareFusion was not in breach of this Non-Compete because CareFusion had restricted his activities so that he was not involved in the "research, development, design modification, pricing, sales or marketing of: (1) the Alaris Syringe Module infusion pump; [and] (2) [numerous] airway products." *See* Docket #25, Frisbie Decl. ¶ 23, Ex. D.  As this Court already noted, however, this proposed restriction was insufficient to bring Mr. Frisbie into compliance with the text of the Non-Compete, and therefore Smiths Medical was likely to prevail on its claim for breach of the Non-Compete.  *See* TRO Decision, 2013 WL 268988, at *3.

As an initial matter, and as the Court already has noted, CareFusion's proposed restrictions conspicuously leave out the concept of "manufacturing."  Under the Non-Compete, Mr. Frisbie agreed that he would not "render services, directly or indirectly, to any Conflicting Organization nationwide in connection with the *design, development or manufacture* of a Conflicting Product."  Seshadri Decl. Ex. A, § F(b) (emphasis added). Offering to restrict Mr. Frisbie from rendering services in connection with "research, development, design modification, pricing, sales or marketing" misses the mark.

Moreover, as detailed below, the product categories covered by CareFusion's proposed narrow restriction do not encompass all "Conflicting Products," as that term is defined in the Non-Compete.

> **1.    CareFusion's Entire Infusion Business Constitutes "Conflicting Products" Under The Non-Compete.**

The Non-Compete defines "Conflicting Product" to include

> any product, process, system or service of any person or
> organization other than the Company, in existence or under
> development, which is the same as or similar to or competes
> with a product, process, system or service upon which my
> department has worked during the last two (2) years of
> employment and about which I acquire Confidential
> Information.

*Id.* Ex. A, § F(d).

To determine which CareFusion products constitiute "Conflicting Products" in accordance with the text, one must follow two steps: (1) identify Smiths Medical products upon which Mr. Frisbie worked and about which he acquired confidential information, and then (2) identify any CareFusion products which are "the same as," "similar to" or "compete with" those Smiths Medical products.

The first step is easy and undisputed. Mr. Frisbie worked on and acquired confidential information about Smiths Medical's infusion and respiratory products, including its MedFusion syringe pumps, its CADD-Solis ambulatory pumps and its Graseby large volume pumps. Although certain details are disputed, as a general matter, Mr. Frisbie does not – and cannot – dispute that he acquired confidential information about these products. Indeed, he admits it. *See* Docket #34, Answer, at ¶¶ 14, 15. Given that "Confidential Information" is defined under the contract to include not only scientific data, but also information about manufacturing processes and business plans and strategies, *see* Seshadri Decl. Ex. A, § A.2, Mr. Frisbie could hardly deny that he had "Confidential Information" about these Smiths Medical products. He was, after all, the head of Global Operations and a member of the Board and senior management team.

The next step, then, is to identify any CareFusion products which are "the same as," "similar to" or "compete with" those Smiths Medical products.  In prior proceedings, Mr. Frisbie has contended that only CareFusion's "Alaris Syringe Module" pump is "the same as," "similar to" or "competes with" Smiths Medical infusion pump products because the companies' respective product offerings overlap most substantially with respect to syringe pumps, as opposed to ambulatory or large volume pumps.

Although it is true that, in terms of hardware, there are generally three types of infusion pump – large volume pumps, ambulatory pumps and syringe pumps – these three varieties of pump are not dissimilar products and they are not in separate and distinct markets.  All of CareFusion's infusion products either are "the same as," "similar to" or "compete with" all of Smith's Medical's infusion business.  *See generally* Seshadri Decl.

*First*, any suggestion that the different types of pumps are entirely dissimilar and in separate and distinct markets ignores the fundamental point that all three varieties have the same function – delivery of fluids or medication intravenously into the body.  *Id*. ¶ 14.  For this reason alone, all infusion pumps are "similar" products for purposes of the definition of "Conflicting Product" in the Non-Compete.  Comparing the three types of pump is not akin to comparing "refrigerators, dishwashers and ovens," as Mr. Frisbie argued at the TRO stage.  *See* Docket #22, Def. TRO Mem. at 10.  A better analogy would be a two-door sedan, a four-door sedan and a station wagon.

*Second*, different varieties of infusion pumps are extremely similar products with respect to the way they are designed, developed, manufactured, marketed and sold.

Smiths Medical's different varieties of pump are all designed and developed by the same R&D team, supported by the same software development team, manufactured by the same manufacturing team, and they all come off the same assembly line at the same manufacturing facility and undergo equivalent validation and testing processes. Any knowledge Mr. Frisbie has about the design, development and manufacture of one type of pump is fully translatable to the design, development and manufacture of any other type of pump. Seshadri Decl. ¶ 15. Thus, all infusion pumps are "similar" products for purposes of the definition of "Conflicting Product" in the Non-Compete.

*Third*, treating the three types of pump as separate markets ignores the way in which CareFusion markets its primary infusion offering: the "Alaris System," which may be adapted through use of compatible "modules" to serve as a large volume pump, a syringe pump, or a PCA (patient-controlled or ambulatory) pump. CareFusion's marketing materials, Smiths Medical's internal competitive analyses and evidence of consumer behavior all demonstrate that the entire Alaris System (including all of its component parts) competes against all of Smiths Medical's infusion business. For example:

- CareFusion markets the Alaris System as filling all infusion pump needs for its customers, calling it "the *only* smart pump that can protect *every* infusion, including intermittents, such as antibiotics and chemotherapy, and *all* infusion modalities, including large volume pump, PCA and syringe."

- Smiths Medical's internal competitive analyses of CareFusion (including those created with Mr. Frisbie's input) show that CareFusion's full system competes against each of Smiths Medical's stand-alone pumps.

- Smiths Medical has lost customer accounts for its stand-alone pumps, not to individual modules made by CareFusion, but where such customers decide to buy

CareFusion's Alaris System instead of stand-alone pumps.  Some customers who previously bought Smiths Medical's ambulatory pump or syringe pump, have decided instead to use CareFusion's Alaris System.

Thus, all of CareFusion's infusion business "competes with" each of Smiths Medical's infusion pumps for purposes of the definition of "Conflicting Product" in the Non-Compete.  *Id*. ¶¶ 17-25, Exs. C-F.

*Fourth*, a module-to-module comparison would not reflect the way CareFusion and Smiths Medical compete in the real world for the additional reason that competition is increasingly focused on software and information technology, which support *all* varieties of pump, rather than on differentiation of hardware models.  Smiths Medical and CareFusion both offer software that stores drug protocols, controls dosages, and generally facilitates the delivery of medication to patients.  A key aspect of competition between Smiths Medical and CareFusion is, therefore, the software and information technology which supports *all* of each companies' respective infusion pump models.  This is another reason that all of CareFusion's infusion pump business competes against all of Smiths Medical's infusion business and constitutes "Conflicting Products" as defined in Mr. Frisbie's Non-Compete.  Moreover CareFusion's software products and services themselves constitute "Conflicting Products."  *Id*. ¶¶ 26-33, Exs. F, H-J.

*Fifth*, Smiths Medical and CareFusion do, in any event, compete as to each of the three individual varieties of pump: syringe, ambulatory and large volume:

- In the syringe pump category, Smiths Medical offers several product lines, including its best-selling Medfusion 4000 Syringe Pump.  CareFusion sells the Alaris Syringe Module Pump.

- In the ambulatory category, Smiths Medical offers several ambulatory pump products, including the CADD-Solis pump. These products are sold for use by patients in hospitals and in outpatient contexts, as well as for use in ambulances, emergency medical technician vehicles and other mobile settings. Although CareFusion witnesses claimed otherwise in the papers they filed in opposition to the TRO, CareFusion also offers an infusion pump designed specially for use in ambulatory settings, called the MedSystem III. According to the CareFusion website, the MedSystem III is "ideal for ambulatory/EMT and air transport."

- Smiths Medical does not currently sell a large volume pump in the U.S. market. However, U.S. based personnel are involved in the design, development and distribution of large volume pumps, including the Graseby and Smiths Medical WZ models, on the international market. CareFusion sells large volume pump modules in the U.S.

Thus, CareFusion actually makes products which are "the same as" each of Smiths Medical's infusion products for purposes of the definition of "Conflicting Product" in the Non-Compete. *Id.* ¶¶ 37-42, Exs. K, L.

*Sixth*, Smiths Medical and CareFusion also compete on the basis of disposables and other accessories that accompany infusion pumps. *Id.* ¶¶ 34-36, Exs. C, D, F.

*Seventh*, the restriction proposed by Mr. Frisbie is insufficient also because it does not account for any future products CareFusion may be developing to compete with Smiths Medical's products. Smiths Medical has no visibility into what any such pipeline products may be, but to the extent they will be "the same as," "similar to" or will "compete with" Smiths Medical's infusion products, Mr. Frisbie should be restricted as to them as well. *Id.* ¶ 43.

In sum, CareFusion's entire Alaris System (including all of its "modules"), its related software and information technology, its syringe, ambulatory and large volume pumps, and its intravenous disposables and other infusion accessories are "the same as,"

"similar to," or "compete with" Smiths Medical's infusion products and constitute "Conflicting Products" as defined in Mr. Frisbie's Non-Compete. CareFusion's contention that only the "Alaris Syringe Module" is "the same as," "similar to" or "competes with" Smiths Medical's infusion products is completely artificial and divorced from the reality of how the products function, how they are designed, developed and manufactured, and how they compete in the marketplace.

### 2. Numerous CareFusion Respiratory Products Are "Conflicting Products" Under The Non-Compete.

Within the respiratory area, the companies compete just as intensely and broadly. Their competition spans the airway access category (in which both companies offer, among other products, anesthesia breathing circuits); the hypoxemia management category (including transport ventilators, manual resuscitators, and oxygen and medication delivery devices); and the respiratory care category (including heat moisture exchange filters, closed suction devices and bronchial hygiene/lung expansion devices). They also produce a number of other small or specialty product lines within the respiratory area that compete head-to-head, including nebulizers, filtration and chest drainage devices, tracheostomy care kits and tube holders, oropharyngeal tubes, and nasopharyngeal tubes, among other products. *Id.* ¶¶ 44-49, Exs. N, O.

### B. Enforceability of the Non-Compete.

We understand that the enforceability of the Non-Compete is not disputed. As the Court held in its TRO Decision: "Frisbie…does not argue that the Noncompetition Provision is unenforceable, and instead claims that he has not violated the terms of the

provision." 2013 WL 268988, at *3.  Likewise, in his Answer to the Complaint, Mr.

Frisbie did not raise unenforceability of the Non-Compete as an affirmative defense

(though he did plead the defense that the Non-Compete is contrary to the public policy of

the State of California and that the Notice Provision, which Smiths Medical sought to

enforce at the TRO stage, is unenforceable).  *See* Docket #34, Answer.

In any event, the Non-Compete satisfies all factors by which the enforceability of

a restrictive covenant is determined under Delaware law.[5]  A non-compete will be

enforced under Delaware law where it:  (1) meets general contract law requirements, (2)

is reasonable in geographic scope and temporal duration, (3) advances a legitimate

economic interest of the party enforcing the covenant, and (4) survives a balance of the

equities.  *Am. Homepatient, Inc. v. Collier*, No. Civ. A. 274-N, 2006 WL 1134170, at *2

(Del. Ch. Apr. 19, 2006).   All of these requirements are met here.

*First*, Mr. Frisbie was offered employment as consideration for signing the

Agreement Concerning Confidential Information, Competition and Assignment of

Inventions, and there can be no dispute therefore that the agreement was supported by

adequate consideration.  *See Research and Trading Corp. v. Powell*, 468 A.2d 1301,

1305 (Del. Ch. 1983) (employment adequate consideration for restrictive covenants).

*Second*, the Non-Compete is reasonable in geographic and temporal scope.  The

Non-Compete restricts Mr. Frisbie's activities for only one year.  Covenants of far longer

---

[5]   The contract is governed by Delaware law.  *See* Seshadri Decl. Ex. A, § J.  *See also* TRO
Decision, 2013 WL 268988, at *3.

durations are regularly upheld under Delaware law.  *See, e.g., Hough Assocs., Inc. v. Hill*, No. Civ. A. 2385-N,  2007 WL 148751, at *6 (Del. Ch. Jan. 17, 2007) (non-compete lasting three years from termination of employment was reasonable for founding member and project manager of engineering firm); *Singh v. Batta Envtl. Assocs., Inc.*, No. Civ. A. 19627, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003) (enforcing two year non-compete); *Del. Express Shuttle v. Older*, No. Civ. A. 19596, 2002 WL 31458243, at *14 (Del. Ch. Oct. 23, 2002) (two year non-compete found reasonable for sales and marketing manager).  In light of the broad array of responsibilities held by Mr. Frisbie as head of Global Operations, as well as the technical knowledge and experience he gained at Smiths Medical, one year of restriction is a narrow, conservative protection of the company's interests.  *See Del. Express Shuttle*, 2002 WL 31458243, at *14 ("Reasonableness of duration must be determined based upon the nature of the employee's position and the context of a particular industry.").

The nationwide geographic scope of the non-compete is also appropriate – indeed, it is overly narrow – because Smiths Medical's operations are global.  *See, e.g., O'Leary v. Telecom Res. Serv., LLC*, C.A. No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Jan. 14, 2011) (nationwide non-competition clause valid where company's business conducted nationwide); *Weichert Co. of Penn. v. Young*, C.A. No. 2223-VCL, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007) ("[T]he reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect." ); *Del. Express Shuttle*, 2002 WL 31458243, at *13 ("Restrictions that disallow activities that are 'in

17

competition with' or involve 'soliciting' customers of the employer ... inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer…").

*Third*, the Non-Compete advances Smiths Medical's legitimate interests.  As discussed above in Section II (addressing irreparable harm) and in Mr. Seshadri's Declarations, Mr. Frisbie's employment with a direct competitor immediately puts at risk a wealth of confidential information developed at great expense and effort.  Protection of confidential information "[has] long been recognized as [a] legitimate economic interest[] of a former employer" warranting enforcement of a non-compete.  *Tristate Courier & Carriage, Inc. v. Berryman*, No. 20574-NC, 2004 WL 835886, at \*10 (Del. Ch. Apr. 15, 2004).  Mr. Frisbie's Non-Compete is aimed also at protecting valuable supplier and customer relationships that may be exploited in the wake of his departure.  Docket #20, Seshadri TRO Decl. ¶¶ 52-54, 58.  Such goodwill and established relationships are also well recognized interests justifying post-employment restrictions.  *See, e.g., Weichert Co. of Penn.*, 2007 WL 4372823, at \*3-5 (recognizing former employer's legitimate interest in protecting goodwill with customers, employees, and third-party businesses); *Tristate Courier & Carriage, Inc.*, 2004 WL 835886, at \*10 (employer has a "legitimate interest in preventing [employee's] contacts, developed as an employee and officer of [employer], from being used in competition against it.").

*Finally*, for the reasons described above in Section III (addressing the balance of harms), the balance of equities favors enforcement of the Non-Compete.  Enforcement of the Non-Compete will not harm Mr. Frisbie.  As the Defendant has acknowledged

throughout these proceedings, the Non-Compete is a narrow "activity" restriction, which only limits Mr. Frisbie's activities at CareFusion but does not prevent him from working at CareFusion altogether.  If the restrictions imposed by the TRO are continued, Mr. Frisbie would be restricted only from certain activities, but he would remain employed by CareFusion.  On information and belief, he is being handsomely compensated there.  *See* Hamid Decl. Ex. A.  If the Non-Compete is not enforced, however, Smiths Medical's valuable confidential information will suddenly be at the disposal of a direct competitor, yielding lasting, irreparable harm.  *See, e.g., Singh*, , 2003 WL 21309115, at *10 (finding that balance of equities favored former employer when employee could still work in environmental field by offering services that former employer did not offer).

## V.     The Public Interest Would Be Served By A Preliminary Injunction.

As this Court has already held, the public interest in enforcing contracts weighs in favor of an injunction when an employee is breaching a valid non-compete, notwithstanding the public's interest in unrestricted competition.  *See* TRO Decision, 2013 WL 268988, at *5.

## VI.    The Bond Should Be Reduced Or Lifted.

In its TRO Decision, the Court instructed Smiths Medical to post a bond in the amount of $1.3 million, the amount of Mr. Frisbie's total compensation from Smiths Medical in 2011, which Smiths Medical has done.  *See* Docket #39.  Notwithstanding the restrictions imposed by the TRO, CareFusion is continuing to employ Mr. Frisbie as their head of Global Operations.  *See* Seshadri Decl. Ex. P.  Moreover, on information and

belief, he is being generously compensated by CareFusion despite the TRO restrictions. *See* Hamid Decl. Ex. A.  Accordingly, it does not appear that Mr. Frisbie would suffer any harm at all if the restrictions were continued; presumably he would keep his job at CareFusion and continue to receive generous compensation.

In the context of an action seeking an injunction to restrict employment activities, continued employment during the proceedings obviates the need for a bond.  *See*, *e.g.*, *Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079, 1098 (E.D. Cal. 2012) (ruling that because "the narrow injunction to be entered will not preclude defendant from working in his chosen occupation" and in the absence of "evidence that defendant has been terminated, or will be terminated," no bond was necessary).

As Smiths Medical is seeking only a continuation of the restrictions currently in place, and where these restrictions have not resulted in Mr. Frisbie losing his employment or compensation from CareFusion, there appears to be no danger of Mr. Frisbie suffering damages as a result of the injunction.  Plaintiff therefore respectfully requests that the bond be reduced dramatically or lifted entirely.

**<u>CONCLUSION</u>**

For the foregoing reasons, Smiths Medical respectfully requests that the Court grant its application for a preliminary injunction.


Dated: February 6, 2013

Respectfully submitted,

GREENE ESPEL PLLP

<u>s/ Lawrence M. Shapiro</u>
Lawrence M. Shapiro, P.A. #130886
Campbell Mithun Tower – Suite 2200
222 South Ninth Street
Minneapolis, Minnesota 55402
(612) 373-0929

-and-

DEBEVOISE & PLIMPTON LLP
Jyotin Hamid, Esq.*
Claire Martirosian, Esq.*
919 Third Avenue
New York, New York 10022
(212) 909-1031
*Admitted *pro hac vice*

*Counsel for Plaintiff Smiths Group, plc*