UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

-------------------------------------------------------

SMITHS GROUP, PLC,

                                         Case  No. 0:13-cv-00052-DSD-TNL

               Plaintiff,

    vs.

RONALD A. FRISBIE,

               Defendant.

-------------------------------------------------------

## DECLARATION OF SRINIVASAN SESHADRI IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, SRINIVASAN SESHADRI, being duly sworn under oath, depose and say:

1.    I am over the age of 18 and competent to testify.  I am the President of Smiths Medical, an unincorporated division of Smiths Group plc.  I submit this declaration, on personal knowledge and, where indicated, on information and belief, in support of Smiths Medical's application for an order enjoining Ronald A. Frisbie from breaching his non-compete obligations to Smiths Medical.

2.    As the Court is aware, I submitted a Declaration and a Supplemental Declaration in support of Smiths Medical's motion for a temporary restraining order.  In those declarations, I detailed Mr. Frisbie's duties and responsibilities at Smiths Medical, his access to our confidential information, his departure to work for a direct competitor, and the reasons why we would suffer irreparable harm absent injunctive relief.  I incorporate those prior declarations by reference, and I will not repeat the facts stated in

1

them, except where helpful to the reader for ease of reference.

## Introduction

3.     Mr. Frisbie agreed that for one year following the termination of his employment at Smiths Medical he would "not render services, directly or indirectly, to any Conflicting Organization nationwide in connection with the design, development or manufacture of a Conflicting Product."  I understand that a key issue disputed by the parties concerns the scope of activities from which Mr. Frisbie should be barred in order to comply with this contractual obligation.  Mr. Frisbie contends that he can comply with this obligation if he restricts his activities with respect to CareFusion's Alaris Syringe Module infusion pump.

4.     The restriction proposed by Mr. Frisbie is far too narrow and would be meaningless for all practical purposes.  This is for several reasons which I explain more fully in the body of this declaration:

- All infusion pumps serve the same basic function:  delivery of medications or fluids intravenously into the body.

- All infusion pumps are highly similar products.  Our different varieties of pump are all designed and developed by the same R&D team, supported by the same software development team, manufactured by the same manufacturing team, and they all come off the same assembly line at the same manufacturing facility and undergo equivalent validation and testing processes.

- CareFusion manufactures and sells an entire Alaris System (of which the Alaris Syringe Module is only one attachment) which it markets as filling all infusion pump needs.  The Alaris System is marketed as a replacement

2

for, and therefore competes directly with, all of Smiths Medical's infusion products.

- A key aspect of the competition between Smiths Medical and CareFusion concerns the technology, including software, which supports the companies' respective infusion pumps to store information, control dosage and communicate with hospitals' and other caregivers' information technologies. Focusing on one particular hardware model (the Alaris Syringe Module), therefore, willfully ignores the fact that a key aspect of competition between Smiths Medical and CareFusion is the software and information technology which supports *all* of each companies' respective infusion pump models.

- Even if one ignores software and information technology and focuses solely on hardware (which would be an artificially myopic view of the competitive landscape), Mr. Frisbie's proposed restriction would still be too narrow. In addition to the Alaris Syringe Module pump, which competes with our syringe pump models, CareFusion also makes an ambulatory pump (the MedSystem III), which competes with our ambulatory pumps, and several large volume pumps. Although our large volume pump is not sold in the U.S., it was developed and designed here.

- In addition to pumps themselves, both companies' infusion businesses include intravenous disposables and other accessories that go along with pumps. We compete with respect to these disposables and other accessories as well.

- The restriction proposed by Mr. Frisbie is insufficient also because it does not account for any future products CareFusion may be developing to compete with our products. Naturally, Smiths Medical has no visibility into what any such pipeline products may be, but to the extent they will compete with our business, Mr. Frisbie should be restricted as to them as well.

5. In sum, CareFusion's entire Alaris System (including all of its "modules"), its related software and information technology, its syringe, ambulatory and large volume pumps, and its intravenous disposables and other infusion accessories compete directly

3

with Smiths Medical's infusion business and constitute "Conflicting Products" as defined in Mr. Frisbie's non-compete.

6.     Mr. Frisbie knows this.  Our strategic plans, business plans and competitive analyses (some of which are attached hereto in redacted form and discussed below) all show that we view CareFusion as a key competitor, not just with respect to its Syringe Module, but rather with respect to its entire Alaris System and its related technology, software and accessories.  These documents pre-date this dispute, and Mr. Frisbie was instrumental in preparing some of them while he was still our head of Global Operations.

7.     In addition to the infusion business, I understand that it is undisputed that Smiths Medical and CareFusion compete directly with respect to a broad range of respiratory products, addressed briefly below.

8.     Although I understand that Mr. Frisbie quibbles with some aspects of the confidential information I ascribed to him in prior declarations, he does not – and cannot – deny that, as a member of Smiths Medical's senior management team and divisional board, and as its head of Global Operations, he has knowledge of a broad range of sensitive, competitively valuable information about our infusion and respiratory businesses.

## Mr. Frisbie's Non-Compete Contract

9.     For ease of reference, I briefly review the key contractual obligation at issue on this motion.  Before Mr. Frisbie started at Smiths Medical, he and I negotiated

and executed two contracts governing the terms and conditions of his employment and

certain post-employment covenants:  a contract entitled Terms of Employment and an

attached agreement entitled Agreement Concerning Confidential Information,

Competition and Assignment of Inventions.   (Copies of both are attached together as

**Exhibit A**.)

      10.    Pursuant to Section F of the Agreement Concerning Confidential

Information, Competition and Assignment of Inventions, Mr. Frisbie agreed to a one-year

non-compete.  Specifically, Section F(b) provides:

> I agree that for a period of one (1) year after termination of
> my employment with the Company: . . . [i]f I have been or am
> employed by the Company in a non-sales or marketing
> capacity, I will not render services, directly or indirectly, to
> any Conflicting Organization nationwide in connection with
> the design, development or manufacture of a Conflicting
> Product.

The contract defines "Conflicting Organization" as:

> any person or organization or affiliate thereof which is
> engaged in, or about to become engaged in, the research or
> development, production, marketing, leasing, selling or
> servicing of a Conflicting Product.

The contract defines "Conflicting Product" as:

> any product, process, system or service of any person or
> organization other than the Company, in existence or under
> development, which is the same as or similar to or competes
> with a product, process, system or service upon which my
> department has worked during the last two (2) years of
> employment and about which I acquire Confidential
> Information.

11.     As discussed further below, CareFusion is a "Conflicting Organization,"

and CareFusion's infusion pumps and airway product lines are "Conflicting Products," as

defined in the contract.

## Competition in the Infusion Pump Market

12.     Infusion pumps are devices that deliver medications or fluids intravenously

into the body.  There is no question that Smiths Medical and CareFusion are direct

competitors in the global market for infusion pumps.  The Smiths Group annual report

(excerpt attached as **Exhibit B**) lists CareFusion as one of only eight named "major

competitors" of Smiths Medical.  Smiths Medical's medication delivery business is one

of our most important lines and accounts for over $300 million in annual revenue.

13.     It is true, as declarations submitted by both sides in this matter describe,

that, in terms of hardware, there are generally three types of infusion pump – large

volume pumps (used in hospitals and other institutional contexts), ambulatory pumps

(used by patients in hospitals and in outpatient contexts) and syringe pumps (used in

hospitals and other institutional contexts).

14.     However, these three varieties of pump are not in separate and distinct

markets.  Any suggestion that they are ignores the fundamental point that all three

varieties have the same function – delivery of fluids or medication intravenously into the

body.

15.     The technology and manufacturing underlying each variety of pump

overlaps substantially.  Despite some important differences, different varieties of infusion pumps are very similar products with respect to the way they are designed, developed, manufactured, marketed and sold.  Our different varieties of pump are all designed and developed by the same R&D team, supported by the same software development team, manufactured by the same manufacturing team, and they all come off the same assembly line at the same manufacturing facility and undergo equivalent validation and testing processes.  Any knowledge Mr. Frisbie has about the design, development and manufacture of one type of pump is fully translatable to the design, development and manufacture of any other type of pump.

16.     Moreover, treating the three types of pump as separate markets ignores several indisputable realities about the competitive dynamics of the infusion market (detailed below) including:

- CareFusion markets a "system" as an alternative to *all* separate varieties of pump.  The market generally is gravitating toward stackable "systems" rather than stand-alone models.

- Competition is increasingly focused on software and information technology, which support *all* varieties of pump, rather than differentiation of hardware models.

- Competition is increasingly focused on "interoperability" among different varieties of pumps made by different manufacturers, rather than differentiation of hardware models.

- Competition includes the markets for disposables and accessories, not just the pumps themselves.

- In any event, Smiths Medical and CareFusion do compete as to each of the three individual varieties of pump: syringe, ambulatory and large volume.

"Systems" vs. "Stand-Alones"

17.     CareFusion's primary infusion offering is the "Alaris System," which may be adapted through use of compatible "modules" to serve as a large volume pump, a syringe pump, or a PCA (patient-controlled or ambulatory) pump.  CareFusion markets the Alaris System as filling all infusion pump needs for its customers.

18.     The Alaris System is marketed as a comprehensive solution which eliminates the need for all single modality pumps, such as Smiths Medical's individual syringe, ambulatory and large volume pumps.  For example, the relevant product page from CareFusion's website describes the Alaris System as "the *only* smart pump that can protect *every* infusion, including intermittents, such as antibiotics and chemotherapy, and *all* infusion modalities, including large volume pump, PCA and syringe." (emphasis in original) (A printout of the product page is attached as **Exhibit C**.)

19.     Similarly, a product brochure published by CareFusion aggressively markets what CareFusion describes as "[t]he power of one standardized system."  The brochure sets forth CareFusion's marketing pitch that clinicians, pharmacists and information technology professionals in the healthcare field should prefer CareFusion's single Alaris System to the stand-alone modalities offered by competitors like Smiths Medical.  (A copy of the brochure is attached as **Exhibit D**.)

20.   Smiths Medical recognizes that it competes with the entire Alaris System. For example, a confidential internal competitive analysis, which we prepared while Mr. Frisbie was still our head of Global Operations, compares our best-selling Medfusion 4000 syringe pump to the entire CareFusion Alaris System.  It is noteworthy that our competitive analysis was not limited to the Alaris Syringe Module, which is the module that is most similar to our stand-alone syringe pump, but rather to the entire system. Indeed, the key competitive feature that we noted is that CareFusion offers a modular system instead of stand-alone pumps.  At the end of the document, in the section labeled "summary of Medfusion disadvantages" we note the competitive threat posed by CareFusion's "single-system" positioning.  Although we do not actually believe that customers are better off with the Alaris System, the point we make in this document is that CareFusion's marketing claim to that effect is a competitive threat we face.  (A redacted and excerpted copy of the document is attached as **Exhibit E**.)

21.   The fact that Smiths Medical recognizes that it competes with the entire Alaris System is further illustrated by a confidential competitive assessment we prepared last year (before Mr. Frisbie left) entitled "CareFusion: Market Position and Implications to Smiths Medical."  Again, it is noteworthy that we did not do a module-to-module comparison, comparing CareFusion's syringe pumps to ours, CareFusion's ambulatory pumps to ours, and so on.  That kind of comparison is simply not relevant to how our companies compete.  Rather, we note in the "Competitor dynamics/behaviors" section

that "CareFusion [] continue[s] to drive [a] system sales approach" and sells a "complete line" with "modular system and stackability."  (A redacted and excerpted copy of the document is attached as **Exhibit F**.)

22.   In short, both CareFusion's marketing materials and Smiths Medical's internal competitive analyses (created before Mr. Frisbie left us) demonstrate that the entire Alaris System (including all of its component parts) constitutes a "Conflicting Product" as defined in Mr. Frisbie's non-compete – i.e., "any product, process, *system* or service of any person or organization other than the Company, in existence or under development, which is the same as *or similar to or competes with* a product, process, system or service upon which my department has worked."  *See* **Exhibit A** (emphasis added.)

23.   A recent development at a major pediatric hospital illustrates palpably that customers also do not view the three varieties of hardware pumps as separate and distinct markets.  The hospital previously used large volume pumps manufactured by one of ours and CareFusion's competitors.  When the competitor's large volume pump was recalled as a result of FDA issues, the hospital suspended orders not only of the competitor's large volume pumps but also of Smiths Medical's syringe pumps.  On information and belief, the hospital is now considering use of CareFusion's Alaris System instead of all the pumps the hospital previously contemplated ordering from Smiths Medical or the other competitor.  The hospital evidently does not view the competitor's large volume pump,

Smiths Medical's syringe pump, and CareFusion's system as being in separate and unrelated markets.  Rather, this example shows that customers view all varieties of infusion pumps as being in one interrelated market.

24.    Another way to illustrate the reality that customers view all varieties of infusion pumps as being in one interrelated market is to examine customer accounts we have lost to CareFusion.  In our last fiscal year, we lost to CareFusion approximately 21 hospital accounts to which we previously sold ambulatory pumps, representing more than 1500 units and more than $4 million of revenue.  In the same period, we have also lost approximately 5 hospital accounts to which we previously sold syringe pumps, representing more than 1500 units and more than $6 million of revenue.  Importantly, we did not lose the accounts which previously purchased our ambulatory pumps to CareFusion's "ambulatory module," nor did we lose the accounts which previously purchased our syringe pumps to CareFusion's "syringe module."  Rather, in all cases, the account decided to use CareFusion's entire "Alaris System" instead of our stand-alone pumps.  (We have also won our share of accounts away from CareFusion.)

25.    Another illustration of the reality that the marketplace views all varieties of infusion pumps as being in one interrelated market is the fact that, when CareFusion and Smiths Medical apply to contract with group purchasing organizations (such as Novation), Smiths Medical generally submits bids for stand-alone pumps while CareFusion submits bids for its entire Alaris System.  Thus, in pursuit of these extremely

lucrative contracts, Smiths Medical's stand-alone pump models are in direct competition

with the entire Alaris System.  Each of these contracts can be worth as much tens of

millions of dollars in revenue.

Software and Information Technology

26.    A module-to-module comparison would not reflect the way CareFusion and

Smiths Medical compete in the real world for the additional reason that competition is

increasingly focused on software and information technology, which support *all* varieties

of pump, rather than on differentiation of hardware models.

27.    In addition to and in conjunction with hardware, Smiths Medical and

CareFusion both offer software that stores drug protocols, controls dosages, and generally

facilitates the delivery of medication to patients.  Our software products include

PharmGuard Medication Safety Software, PharmGuard Server Infusion Management

Software, CADD-Administrator Software, CADD-Sentry Pro Medication Safety

Software, and telecommunications software that enables connection between customers'

computers and pump products.  CareFusion offers similar software, including the

Guardrails Suite MX software, which similarly stores drug protocols and controls

dosages in conjunction with CareFusion's various infusion pump products.   (A printout

of the Guardrails Suite MX page from CareFusion's website is attached as **Exhibit G**.)

28.    A key aspect of competition between Smiths Medical and CareFusion is,

therefore, the software and information technology which supports *all* of each

companies' respective infusion pump models.

29.   Smiths Medical's latest strategic plan (which Mr. Frisbie helped create), for example, notes that a major trend in the infusion competitive landscape is that "[s]oftware differentiation [will] outpace[] hardware innovation."  (A redacted and excerpted copy of the document is attached as **Exhibit H**.)

30.   A confidential internal competitive analysis comparing our PharmGuard software to CareFusion's Guardrails software demonstrates that the two companies compete with regard to their respective software capability across all their respective varieties of hardware pumps.  (A redacted and excerpted copy of the document is attached as **Exhibit I**.)

31.   Although Mr. Frisbie was not directly responsible for software design and coding, software is an integral part of the products for which he was responsible.  The design, development and manufacturing functions for which Mr. Frisbie was responsible must be closely coordinated with the development of the software supporting the products.  All of Smiths Medical's infusion pumps compete with all of CareFusion's infusion pumps because both companies compete on the basis of the software that supports their pumps.  For example, Smiths Medical's confidential competitive assessment of CareFusion notes that because of competitor dynamics, there has been a "shift" in the market from "hardware sale to system solution sale (hardware, software, support and software maintenance)."  *See* **Exhibit F.**  This is another reason that all of

CareFusion's infusion pump business constitutes "Conflicting Products" as defined in

Mr. Frisbie's non-compete.  Moreover CareFusion's Guardrail software products and

services themselves constitute "Conflicting Products."

Interoperability

32.    Related to the issue of software is the concept of "interoperability," which

refers to the ability of infusion pumps to share data with external systems, such as a

hospitals' electronic medical record or health information systems.

33.    A confidential Smiths Medical Business Plan concerning "interoperability"

reflects that this functionality is yet another basis on which all of Smiths Medical's

infusion business competes with all of CareFusion's infusion business, and yet another

reason that walling Mr. Frisbie off from just one CareFusion model would be completely

meaningless and divorced from the reality of the way in which the companies compete.

The Business Plan reflects that it required Mr. Frisbie's approval and sets forth a plan for

improving the interoperability of Smiths Medical's infusion pumps.  In the section

entitled "Competitive Overview," the Plan notes that competition in the infusion market

is increasingly based on "software capabilities along with connectivity to the [electronic

medical record system of hospitals]."  The plan further notes that CareFusion has been a

leader in delivering wireless functionality and [electronic medical record] integration."

Notably, the discussion contains no module-to-module comparisons.  That is simply not

the way our companies compete.  Our entire line of infusion products competes against

CareFusion's entire line based on various functionalities, including software and interoperability, among others.  (An excerpted copy of the document is attached as **Exhibit J**.)

Disposables and Accessories

34.    Smiths Medical and CareFusion also compete on the basis of disposables and other accessories that accompany infusion pumps.

35.    As CareFusion's marketing materials reflect, its Alaris System is marketed as being able to supplant the various disposables and accessories used in connection with the single-module devices offered by Smiths Medical and other competitors.  The role of such products would be filled by devices and components compatible with or included in the Alaris System and made by CareFusion.  *See* **Exhibits C and D**.

36.    Smiths Medical's confidential competitive assessment of CareFusion notes that competitors, including CareFusion, are "using hardware, software and disposable combination contracts for enhanced pricing flexibility."  *See* **Exhibit F.**

Pump Varieties

37.    In any event, even if one focuses solely on hardware, Smiths Medical and CareFusion do compete as to each of the three individual varieties of pump: syringe, ambulatory and large volume.

38.    In the syringe pump category, Smiths Medical offers several product lines, including its best-selling Medfusion 4000 Syringe Pump.  CareFusion sells the Alaris

Syringe Module Pump.  These products allow for medication delivery to patients in critical care units, including neonatal and pediatric intensive care units, and are sold primarily to hospitals.

39.     In the ambulatory category, Smiths Medical offers several ambulatory pump products, including the CADD-Solis pump, the CADD-MS3 pump, the CADD-Legacy line of pumps, and the CADD-Prizm VIP System.  These products are sold primarily for use by patients both in hospitals and in outpatient contexts, as well as for use in ambulances, emergency medical technician vehicles and other mobile settings.  When used in hospitals, our ambulatory devices act as "PCA" (Patient Controlled Analgesia) pumps.

40.     Although CareFusion witnesses claimed otherwise in the papers they filed in opposition to our motion for a temporary restraining order, CareFusion also offers an infusion pump designed specially for use in ambulatory settings, called the MedSystem III.  According to the CareFusion website, the MedSystem III is "ideal for ambulatory/EMT and air transport."  (A printout of the MedSystem III page from the CareFusion website is attached as **Exhibit K**.)  Moreover, a strategic planning document authored in part by Rena Bradham (a former Smiths Medical employee who left to work for CareFusion a few months ago and who has now filed a declaration for CareFusion in this action) focused in part on Smiths Medical's CADD line of ambulatory pumps, including the Legacy, Prizm, and VIP devices, and identified CareFusion first among a

16

list of "Key Competitors."  (An excerpted and redacted copy is attached as **Exhibit L**.)

41.   Smiths Medical does not currently sell a large volume pump in the U.S. market.  However, U.S. based personnel are involved in the design, development and distribution of large volume pumps, including the Graseby and Smiths Medical WZ models, on the international market.  CareFusion sells large volume pump modules in the U.S.  Mr. Frisbie was intimately involved in the design, development and manufacture of our large volume pumps.

42.   As noted, both Smiths Medical's and CareFusion's infusion businesses also include intravenous disposables and accessories, including bag access devices, vial access devices, and large volume intravenous administration sets.  (A printout of an excerpt from CareFusion's website describing its infusion accessories is attached as **Exhibit M**.)

Pipeline Products

43.   Both Smiths Medical and, presumably, CareFusion also have future infusion products in their respective pipelines.  I do not know what CareFusion's pipeline contains, for obvious reasons, but I believe that Mr. Frisbie should be restricted from design, development and manufacture of any future products CareFusion may be developing that will also compete in the infusion market.

**Competition in the Respiratory Market**

44.   Smiths Medical and CareFusion also compete in relation to a number of lines in the market for respiratory devices.  (A spreadsheet we have prepared showing the

respiratory products as to which Smiths Medical and CareFusion compete, along with the approximate market shares of each company with respect to each product category, is attached as **Exhibit N**.)

45.     For example, in the "airway access" category, both companies offer anesthesia breathing circuits.  (A printout of the AirLife Respiratory Products page from CareFusion's website is attached as **Exhibit O**.)

46.     Both companies also offer products in the hypoxemia management category, including transport ventilators, manual resuscitators, and oxygen and medication delivery devices.

47.     Both companies offer products in the respiratory care category, including heat moisture exchange filters, closed suction devices and bronchial hygiene/lung expansion devices.

48.      Smiths Medical and CareFusion also compete in a number of other small or specialty product lines within the respiratory area.  Both companies offer nebulizers, filtration and chest drainage devices, tracheostomy care kits and tube holders, oropharyngeal tubes, and nasopharyngeal tubes, among other products.

49.     The product areas in which the two companies compete within the general respiratory category make up a market worth over $1.3 billion.  Although Smiths Medical is in some areas a relatively small player compared to CareFusion (or vice versa), these competitive products generate well over $100 million in annual revenue for Smiths

Medical.

## **Irreparable Harm**

50.     In my previous Declaration, I laid out at length the confidential information belonging to Smiths Medical that is in Mr. Frisbie's possession, as well as the manner in which Smiths Medical will come to irreparable harm should Mr. Frisbie be permitted to work for CareFusion without restraint.  I also described the various third party and internal relationships that will suffer as a result of Mr. Frisbie's employment at CareFusion.  (Seshadri Decl. ¶¶ 39-59.)

51.     After reviewing the declaration submitted by Mr. Frisbie earlier in these proceedings, I understand that the majority of my statements with regard to confidential information of which Mr. Frisbie is aware have not been disputed.  Therefore I will merely summarize those points briefly:

- He was a member of the senior leadership team and the divisional board and was therefore involved in the highest-level strategic decision-making.

- He was involved in the development of our recent global strategic plan, which was presented to the Board of Smiths Group in January and sets out in detail our 3-4 year plan for market competition, product launches, and supply chain improvements.  (Mr. Frisbie denies that he was a "decision-maker" with regard to this plan, but does not deny contributing to it. Frisbie Decl. ¶ 35.)

- Mr. Frisbie is intimately familiar with Smiths Medical's operations technology, including especially those technologies used to manufacture infusion pumps, airway products, and other devices.

- Mr. Frisbie possesses information about costs and margins on all Smiths Medical products.  (Although Mr. Frisbie denies having product-specific

knowledge of raw material and component costs, he does not deny being aware of general product costs and margins, in particular for products in competition with CareFusion's infusion pump and respiratory lines.  He also acknowledges having information with regard to Smiths Medical's "gross margins."  Frisbie Decl. ¶ 31.)

- Mr. Frisbie worked with and helped to develop operational systems and strategies that remain in place across the company's manufacturing and distribution chains.

- He has knowledge of the company's suppliers and recently oversaw the development of a plan to rationalize our manufacturing footprint, a plan which involved a detailed assessment of the strengths and weaknesses of our supply chain and cost structures.  (Mr. Frisbie notes that he did not manage all supplier relationships, and was largely called in to address delivery problems.  Frisbie Decl. ¶ 39.)

- Mr. Frisbie possesses an array of sensitive fiscal information, such as in connection with revenue attainment, inventory management, cost containment, budgeting, and strategic development for entities across the Smiths Medical division.

- Mr. Frisbie is aware of the company's future plans for all products, including infusion pumps and respiratory products.

- Mr. Frisbie is aware of the regulatory status of various Smiths Medical's devices.

- He is privy to the company's plans for new product initiatives, including cost structures, regulatory status, and launch plans, as well as sensitive intellectual property information, including strategies surrounding new and expiring patents.

- He is aware of status and supply availability for customer back-orders.

52.    To these points, I would add that Mr. Frisbie served on a Product Review Committee, an executive group that regularly reviewed strategic plans, and was closely involved with our Value Analysis / Value Engineering ("VAVE") program, a major

strategic initiative aimed at systematically reducing the cost of various products and

achieving ambitious margin goals across several lines.  Through such programs, Smiths

Medical has achieved market-leading margins in several lines, including in its infusion

pump business.  In recent years, we have increased our operating margins considerably.

On information and belief, CareFusion's margins are substantially lower.  The

information Mr. Frisbie gained about how we achieved this result through the VAVE

program would be of immense value to CareFusion's efforts to increase its margins.

53.     I would also add that Mr. Frisbie was intimately familiar with Smiths

Medical quality issues and our prioritization plan for addressing them.  He was similarly

aware of FDA feedback we have received on our infusion and respiratory products and

the current state of any of our discussions with the FDA about such feedback.  These are,

of course, very sensitive matters with obvious competitive value.

### Conclusion

54.     In general, I find it disingenuous for Mr. Frisbie to suggest that he merely

applied general manufacturing principles to Smiths Medical's operations, and that in his

five years as a senior executive earning more than $1 million annually, a member of our

Divisional Board, and our head of Global Operations he did not come into possession of a

trove of information that will be of value to CareFusion's entire infusion and airway

product lines.

55.     Mr. Frisbie had broad responsibility for strategy, manufacturing, and

quality and profitability improvement for all of our infusion pump and respiratory products. He possessed competitively valuable information with respect to all of those functions. Any attempt to argue that the confidential information he possessed can be neatly allocated to one model of pump and not to others would be completely artificial and divorced from reality. Information about strategy, manufacturing, improvement and competitive dynamics apply across the board and simply are not compartmentalized on a model-by-model basis in the real world.

56.    According to Mr. Frisbie's biographical information on the CareFusion website, Mr. Frisbie is head of CareFusion's Global Operations – the exact same function he performed for us. (A print-out of Mr. Frisbie's bio from the CareFusion website is attached as **Exhibit P**.) I believe it is inevitable that he will use or disclose our confidential information if he is allowed to work on the design, development or manufacture of CareFusion's infusion or respiratory products and services.

57.    I also believe that it is obvious that CareFusion is targeting Smiths Medical personnel in order to reap the benefits of such personnel's knowledge of Smiths Medical's business. In recent months CareFusion has hired not only Mr. Frisbie, our head of Global Operations, but also the former head of our infusion business (Rena Bradham) and the former head of our manufacturing operations in Mexico. I understand that in just the past few months, CareFusion has hired two more of our people.

\*       \*       \*

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of February, 2013 at St. Paul, Minnesota.

_____

Srinivasan Seshadri